**AFC CABLE SYSTEMS INC.**

v.

**J. Ronald CLISHAM.**

**Civil Action No. 97–CV–12070–RGS.**

United States District Court,
D. Massachusetts.

May 19, 1999.

Thomas J. McAndrew, Providence, RI, William E. O'Gara, McGovern, Noel & Benik, Providence, RI, for Plaintiff.

Richard M. Gelb, Aaron J. Builwinkel, Gelb & Gelb, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE*

STEARNS, District Judge.

On September 15, 1997, AFC Cable Systems Inc. (AFC) filed this Complaint against J. Ronald Clisham, an ex-employee, alleging that he had breached his 1992 non-compete agreement (the Agreement) and his duty of loyalty (Count I).　AFC also sought an accounting (Count II).[1]　On

---

1.　On September 15, 1997, AFC requested that the court issue a temporary restraining order and/or a preliminary injunction enforcing the terms of the Agreement.　On October 3, 1997, at a hearing on the motions, Clisham agreed that during discovery he would not contact or solicit sales from two AFC customers, Tate

Access Floor, Inc. and Columbia Lighting. The court thereafter granted the parties leave to conduct limited discovery on the issue of whether a valid non-compete agreement was in force when Clisham left AFC in May of 1997.　The scope of this discovery was there-

February 23, 1998, Clisham filed a motion for summary judgment, arguing that under *F.A. Bartlett Tree Expert Co. v. Barrington*, 353 Mass. 585, 233 N.E.2d 756 (1968), his 1994 change in status from consultant to permanent employee rendered the 1992 Agreement void. On March 24, 1998, Clisham filed a motion to strike portions of an affidavit that AFC offered in opposition to the summary judgment motion. On February 3, 1999, the court heard oral argument on both motions.

### FACTS

The undisputed material facts are these. AFC manufactures armored cable and modular wiring products. Clisham worked for AFC in the mid–1980s as its Vice President of Sales. During this employment, Clisham signed a non-compete agreement. He then left AFC to become a real estate developer. In the late 1980s, Clisham returned to AFC, signing another non-compete agreement. During his second stint at AFC, Clisham solicited sales for "modular wiring to home centers." A year later, Clisham decided to resume his career in real estate.

In 1992, Clisham sought a third round of employment at AFC. At the time, the President of AFC, Harry Crump, "was reluctant to re-hire Mr. Clisham, and, to place him on the payroll as he had, on previous occasions, worked for and then left the company." Crump Affidavit. ¶ 6. After AFC's Vice–President, Paul Suprono, voiced support for Clisham, Crump agreed to allow Clisham to return as a "sales consultant" on a 40 hour a week basis. Clisham, however, was not paid a regular salary or given fringe benefits, and was paid only after submitting an invoice.[2]

Upon his return to the company, Clisham signed a new non-compete agreement. The relevant terms of the Agreement are as follows.

This Confidential Information, Trade Secrets, and˙Designs Agreement ("Agreement") is effective as of this *28th* day of *April,* 1991[3] by and between AFC ... and J. Ronald Clisham ("Employee"). In consideration of your employment by American Flexible Conduit Co. (AFC A Monogram Company) (the "Company") and in recognition of the fact that as an employee of the Company you have access to confidential information, I ask that you review and sign this letter....
RECITALS
A. Employee is currently employed as a *Sales Consultant* [inserted by hand][4] at the Company....
C. Employee desires to continue in the employ of the Company and is therefore willing to adhere to the terms and conditions set forth below.

Now therefore, in consideration of the above recitals ... it is agreed as follows:
1. *Non–Competition.* The Employee acknowledges and agrees that AFC is engaged in a highly competitive business.... As long as the Employee is employed by the Company, he or she shall devote his or her full time and efforts to the Company and shall not participate, directly or indirectly, in any capacity, in any business or activity that is in competition with the Company.... During his or her employment with the Company and for the eighteen (18) month period following the effective date of his or her termination or resignation from the Company, the Employee agrees not to directly or indirectly ...

after enlarged, although a second request for an enlargement was denied.

2. AFC did not withhold income taxes on its payments to Clisham or make payroll tax contributions.

3. The year "1991" was changed to "1992," circled, and initialed by Clisham.

4. While it is undisputed that Clisham inserted the title "sales consultant" in this paragraph, there is a dispute of fact as to whether he objected to the use of the term "employee" in the balance of the Agreement.

develop, produce, market, solicit or sell products or services competitive with products or services offered by the Company or to run, manage, operate, consult, control, be employed by, or participate in the management, operation or control of any business venture that is in competition with the Company. Specifically, this shall include but not be limited to the following direct competitors of armored cable and modular wiring products.

Alcan Cable

Alflex Corp.

Alliance Cable Corp. . . . [5]

1. *Non–Competition cont'd.* Included and inherent within this section is the fact that an employee having gained specific knowledge . . . may in no way act as a consultant for any firm, person or persons attempting or desirous of entering the armored cable or modular wiring business.

2. *Recruiting Company Employees.* For the eighteen (18) month period following the effective date of his or her termination or resignation from the Company, the Employee agrees not to directly or indirectly recruit, solicit or induce, . . . any Employees of the Company to terminate their employment. . . .

4. *Customer Confidentiality.* The Employee recognizes that it is essential to the Company's success that all customer information provided to him or her be deemed to be confidential and be properly treated as a trade secret. Therefore, the Employee agrees not to use or disclose any such customer information. . . .

9. *Applicable Law and Choice of Forum.* This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. . . .

10. *Entire Agreement.* This Agreement contains the entire agreement of the parties and supersedes and replaces any other agreements or understandings between them with respect to the subject matter of this Agreement. . . .

As a sales consultant, Clisham worked for AFC out of his home. He was supervised by Suprono. His primary assignment was to investigate and create a niche market for an "OME [original equipment manufacturing] relationship" with "under-raised floor" manufacturers. "Under-raised floors" are used primarily in office buildings to house modular wiring under specially designed floor spaces (as opposed to ceiling space). By all accounts, Clisham succeeded over the next two years in creating such a market.

In early 1994, Clisham became interested in AFC's stock bonus plan and other fringe benefits. At some point, Clisham asked to become a permanent AFC employee. Suprono supported his request.

Q. And did there come a point in time where [Clisham's] role shifted from that of investigating the marketplace to that of bringing to you potential sales?

A. When he became an employee of the company, which was I believe perhaps '94, I think, '94, he then had a completely different role—responsibilities. He was basically on a press program.

What's a press program, Mr. Suprono?

A. A percentage of the sales as a bonus arrangement, and he was now responsible for quoting, selling, and obtaining contracts for the work and he actually went out with the complete authority and carrying the banner of the company, if you will, which was somewhat of a problem as a consultant. One of the reasons why I got him on as employee because he wasn't able to say he was a company person when he gave out his card. He put sales consultant. It didn't go over very well with the

---

**5.** Nineteen companies are listed.

**170**

customers. They didn't feel he was representing the company as an employee.

Suprono Dep., at 32–33.

In March of 1994, Clisham became an AFC "Sales Manager." In his new position, Clisham was considered a "permanent" employee. His compensation was calculated according to a new pay structure and he was eligible for company benefits. He was placed on the company payroll. AFC assumed responsibility for tax withholding and social security contributions. Clisham was still supervised by Suprono, but spent 10 to 20 percent more time on the road. He was also given the authority to sign sales contracts on the company's behalf.

As part of the transition, Clisham received "government forms, the insurance forms, and ... [another] non-compete agreement." Clisham Dep., at 64. The new Agreement was identical to Clisham's 1992 Agreement. Clisham, however, felt, that given his age (55), he could not sign an agreement that would restrict his future employment options.

Despite repeated requests by AFC officials, Clisham never signed the 1994 Agreement. Clisham, however, never directly told anyone at AFC of his decision not to do so. Suprono testified that he asked Clisham to sign the new Agreement between ten and fifteen times.

I would perhaps have lunch with Harry Crump once every other week, and Harry would get on my back about Ron not signing the agreement as yet, and I would go back quite often and say "Ron, you got to sign the agreement." As a matter of fact there was one point in time in 1996 that I was informed by Harry to tell Ron—I don't know if I told Ron or not—that he would not receive his bonus unless that agreement was signed, so it was a continuous thing that I would go to Ron and say "Ron, sign

the agreement. You have to sign the agreement."

Suprono Dep., at 55.

In 1997, Clisham left AFC and began working for a company that AFC alleges is a competitor. AFC thereafter filed this lawsuit alleging that Clisham's present employment violates the terms of the 1992 non-compete Agreement.

*The Motion to Strike*

Clisham argues that he is entitled to summary judgment because the undisputed evidence establishes that there was no binding agreement in place for him to violate. Clisham argues that AFC's repeated requests that he sign a new non-compete agreement demonstrates that AFC understood that his status at the company had materially changed and that the 1992 Agreement was no longer valid.

With its opposition to Clisham's summary judgment motion, AFC submitted an affidavit from Harry Crump attempting to explain that AFC only requested that a new Agreement be signed because it did not realize that Clisham had signed the 1992 Agreement. AFC argues that, given Crump's testimony, its attempts to obtain Clisham's signature on a new Agreement in 1994 have no bearing on the validity of the 1992 Agreement.

The Crump Affidavit states, in pertinent part:

13. In 1994, when Mr. Clisham went on the regular payroll, I was notified by Linda Ross, who maintained custody of the non-competition agreements, that a non-competition agreement could not be located for Mr. Clisham. I spoke on several occasions with Mr. Suprono regarding the need to have Mr. Clisham sign the non-competition agreement.

14. I believe I learned in 1995 that Mr. Clisham had, in fact, already executed the non-competition agreement. I believe that Linda Ross informed me that the file containing Mr. Clisham's records had been located, and that Mr. Clisham

had executed a non-competition agreement.

Clisham moved to strike the Crump Affidavit arguing that the statements attributed to Ross are hearsay, and that Crump's statements based on "belief" have no evidentiary weight. AFC then obtained an affidavit from Ross in an attempt to corroborate Crump's statements. The problem with the Ross Affidavit is that it does not support Crump's assertion that AFC only requested that Clisham sign the new Agreement because Ross had told him that no previous Agreement had been signed. The Ross Affidavit states, in relevant part:

11. Prior to the time that the company established a "formal" personnel office, various employees of the company performed personnel duties and responsibilities, as I did in my role as Executive Secretary to the President, for select high-level employees.

12. Sometime in 1994, I recall Mr. Crump asking me to determine whether the company had a signed Non–Competition Agreement from J. Ronald Clisham.

13. I thereafter reviewed the files that I maintained for high-level employees, and found the personnel file that I maintained for Mr. Clisham.

14. My review of Mr. Clisham's personnel file indicated that he had signed a Non–Competition Agreement, which is attacked hereto.

15. I thereafter reported to the President, Mr. Crump, that I had, in fact, located Mr. Clisham's personnel file, and that it contained a signed Non–Competition Agreement.

16. In 1994, or any time thereafter, it would not have been my responsibility to ask Mr. Clisham, or anyone else, to sign a Non–Competition Agreement....

The motion to strike the Crump Affidavit will therefore be *ALLOWED.*

### DISCUSSION

Clisham seeks summary judgement on two grounds. First, he argues that as a matter of law, when his employment status at AFC changed substantially in 1994, the 1992 Agreement terminated and did not carry over to his newly negotiated and permanent position as a Sales Manager. Second, Clisham argues as a factual matter, that the conduct of the parties establishes that neither believed that he remained bound by the old Agreement.

Clisham's first argument relies on *Bartlett Tree,* supra. The facts of *Bartlett Tree* are analogous and instructive.[6] When the defendant in *Bartlett Tree* began working for the Bartlett Tree Expert Company in 1948, he signed a non-compete agreement which restricted him from working in the field of tree care for two years. In 1966, when the defendant left the company to start his own landscaping business, Bartlett Tree brought a lawsuit to enjoin him from establishing a competing business. The Court ruled, however, that the otherwise valid restrictive covenant contained in the 1948 non-compete agreement "was inoperative" because the defendant's employment relationship with *Bartlett Tree* had substantially changed over the years. The Court stated:

Under the 1948 contract the defendant was hired to work "in the capacity of [s]alesman under the Bartlett Sales Plan dated April 1, 1943." Paragraph 6 of the contract recited that the defendant was familiar with that plan and was to be paid in accordance with the rate fixed by it. The defendant worked as a salesman under the Bartlett plan from 1948 to 1960. In 1960 and again in 1965 certain cha[n]ges in the terms of employment were made. These changes, as found by the judge, in substance were

---

6. To the extent that AFC has argued that the court should be guided by cases from other jurisdictions, the court notes that Paragraph 9 of the Agreement requires that it be construed under Massachusetts law.

as follows: In 1960 the plaintiff introduced a new sales plan, known as Sales Plan No. 3, under which it required the defendant to work. This plan made substantial changes in the defendant's remuneration and in his sales area. At the time of these changes the plaintiff submitted a written contract incorporating the new terms to the defendant, who refused to sign it and sent it back to the plaintiff. The defendant, nevertheless, worked under the new plan until January 1, 1965, when he became a district sales manager in a new area with a new basis of remuneration.

The judge concluded that the conduct of the parties shows a clear new employment contract in both 19[6]0 and 1965 and that the 1948 contract was abandoned and rescinded by mutual consent. There was no error.

The defendant worked under the 1948 contract for twelve years. In 1960, the defendant's rate of compensation and sales area were changed. Such far reaching changes strongly suggest that the parties had abandoned their old arrangement and had entered into á new relationship.[7]

The changes occurring in 1965 are more fundamental than those of 1960. In 1965 the defendant was promoted from salesman to district sales manager and assumed new responsibilities. Once again the defendant's remuneration and territorial duties changed. It cannot be said, as the plaintiff argues, that the general purposes of the 1948 contract remained undisturbed by the changes in pay, work area or position. There are undoubtedly situations where changes of

this sort amount to no more than modifications of the original agreement, leaving the other provisions in effect. This is not such a case. An examination of the 1948 contract reveals that, in addition to references to pay, territory and position, it contains only a restrictive covenant and a termination clause. It is hard to see how changing pay and territory in 19[6]0 and changing pay, territory and position in 1965 amount to mere modifications of the 1948 contract.

The conduct of the parties from 1960 to the date the defendant terminated his employment relationship with the plaintiff is inconsistent with an intention that the 1948 contract be continued in effect. *Devlin v. Newfell,* 275 Mass. 279, 175 N.E. 647. See *Hanson & Parker, Ltd. v. Wittenberg,* 205 Mass. 319, 326–327, 91 N.E. 383; Restatement: Contracts, § 406, comment b. We agree with the conclusions of the judge that the 1948 contract was inoperative when the defendant terminated his employment with the plaintiff.

*F.A. Bartlett Tree,* 353 Mass. at 587–588, 233 N.E.2d 756. (Footnote [7] in the original.)

AFC argues that summary judgment is inappropriate because there is a dispute of fact as to whether Clisham was "actually" an independent contractor from 1992 to 1994. AFC maintains that Clisham's subsequent employment as a Sales Manager was simply a continuation of his original employment.[8] AFC misses the point of *Bartlett Tree.* While there may be a dispute as to whether Clisham, for example, could qualify as an independent contractor for tax purposes, the Court in *Bartlett*

---

**7.** "In this connection it is perhaps worth noting that the 1960 contract, unsigned by the defendant, stated that '(t)his employment contract supersedes any prior employment agreement, contract or sales plan agreement by the parties hereto.' "

**8.** AFC argues that there is a dispute of fact as to whether Clisham was an independent contractor because (1) he executed the non-compete agreement which used the word "em-

ployee," (2) he did not work for any other employer during the time period (although he was forbidden by the non-compete agreement from doing so); (3) he received a fixed salary (rather than payment per project), (4) he was compensated for his expenses, (5) his supervisor oversaw his work closely, and (6) his resume listed his AFC employment as "1990 [to the] present."

*Tree* focused not on the defendant's legal status as an employee, but on the nature of the changes in his employment relationship with the plaintiff.[9]

AFC argues that the facts of *Bartlett Tree* are nonetheless distinguishable. AFC contends that it is significant that the restrictive covenant in *Bartlett Tree* was signed eighteen years before the employer sought to enforce it, while Clisham signed the 1992 Agreement just five years prior to his departure from the company. AFC also contends that it should be able to rely on the fact that Clisham failed to affirmatively state that he would not sign the 1994 Agreement. Finally, AFC argues that any changes in Clisham's employment in 1994 were superficial.

The facts and the ruling in *Bartlett Tree* do not support AFC's argument. (In *Bartlett Tree*, the Court deemed a five year hiatus between changes in the defendant's job description to be a significant break). The record is clear that Clisham's employment relationship with AFC materially changed in 1994. The most significant evidence is that AFC began treating Clisham differently. Before 1994, AFC did not award Clisham any of the benefits associated with permanent employment, nor did it act as Clisham's formal employer. After his promotion to Sales Manager, AFC paid benefits to Clisham, withheld his taxes, and paid into Social Security on his behalf. Clisham's title changed, his pay structure changed, his authority increased, his unsupervised time on the road increased, and the focus of his work changed from investigating a potential market to making sales.

These changes, coupled with AFC's repeated efforts to have Clisham sign a new non-compete agreement, make it clear that Clisham had entered a new employment relationship with AFC, thereby voiding the 1992 Agreement. That AFC wanted the protections of a non-compete agreement is manifest from its actions. AFC, however, never obtained one. While AFC was free

to terminate Clisham for his refusal to sign a new Agreement, it chose instead to drop the subject and hope for the best. AFC's regrets cannot now create a binding agreement where AFC, largely by its own inaction, failed to obtain one.

### ORDER

For the foregoing reasons, defendant's motion for summary judgment is *ALLOWED*.

SO ORDERED.

---

9. The defendant's status in *Bartlett Tree* never changed from that of a permanent employee.