# United States Court of Appeals
## For the First Circuit

No. 04-1522

NORTHERN LAMINATE SALES, INC.,

Plaintiff, Appellee,

v.

LAWRENCE E. DAVIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, <u>U.S. Magistrate Judge</u>]

Before

Torruella, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Stahl, <u>Senior Circuit Judge</u>.

<u>Paul B. Kleinman</u>, with whom <u>Bouchard & Kleinman, P.A.</u>, was on brief for appellant.
<u>Catherine R. Connors</u>, with whom <u>Lawrence M. Edelman</u> and <u>Pierce Atwood, LLP</u>, were on brief for appellee.

April 1, 2005

**STAHL**, <u>**Senior Circuit Judge**</u>. Plaintiff-Appellee Northern Laminate Sales, Inc. ("NLS"), a New Hampshire corporation, sued Defendant-Appellant Lawrence E. Davis ("Davis"), a New York resident, personally in New Hampshire for tortiously inducing NLS to extend credit to the company of which Davis was an officer. A jury returned a verdict in NLS' favor, awarding NLS $219,946.46 in damages. Davis appeals, claiming that the district court did not have jurisdiction over his person and that the jury incorrectly calculated the amount of damages. Finding no error, we affirm.

## I. BACKGROUND

### A. The Parties

This case involves three corporations, the first of which, Appellee NLS, is both incorporated and has its principal place of business in New Hampshire. Miles Russell is the president and owner of NLS, which is in the business of distributing laminate components for printed circuit boards. The second corporation, American Board Companies ("ABC"), was a manufacturer and fabricator of printed circuit boards. ABC was incorporated in New York, and maintained a manufacturing facility in Vestal, New York. ABC was an affiliate (by common ownership) of the third corporation involved, The Matco Electronics Group ("Matco"), a Delaware corporation. Matco was an "administrative and materials procurement corporation," the subsidiaries of which included contract manufacturers, designers, and assemblers of printed

circuit boards. At all relevant times, Appellant Davis, an individual who resides in Vestal, New York, served as secretary, treasurer, Chief Financial Officer, and Director of Matco and all of the Matco affiliates (including ABC).

**B.        The Relevant Contacts**

On or about January 13, 2000, NLS and Matco entered into an agreement pursuant to which NLS furnished laminate components to ABC. The components were shipped F.O.B. NLS' New Hampshire facility, with invoices providing that New Hampshire law governed. Under the terms of the agreement, NLS would transport the components to the ABC manufacturing facility in New York, where NLS would keep, maintain, and periodically replenish the stock of components. ABC, on an as-needed basis, would draw its raw materials from that stock and issue corresponding purchase orders. NLS would then, in turn, prepare and issue invoices to ABC. The payment terms of the agreement required that ABC issue weekly checks to NLS in New Hampshire satisfying all invoiced charges that were fifty-three or more days old.

1.        <u>September 14 Meeting in New York</u>

Concerned over increasingly delinquent payments by ABC to NLS, NLS president Miles Russell faxed a letter on September 1, 2000 to James F. Matthews, the president and sole shareholder of Matco, ABC, and the Matco affiliates, requesting a meeting to discuss ABC's financial condition. Russell concluded the letter by

stating "[w]ithout such a meeting, I must inform you that I will need to significantly alter the terms with which our two organizations currently conduct business." Russell copied Davis on the letter.

In response, Davis invited Russell to meet with him at Matco's New York offices on September 14, 2000.[1] Russell drove from New Hampshire to New York to meet with Davis as arranged. At the time of the meeting, the balance owed by ABC to NLS was $495,685.65. During the meeting, Russell claims that Davis made six relevant representations: (1) Matco was committed to the support of ABC; (2) Matco would be willing to guarantee ABC's payment of debt obligations owed to NLS; (3) the ABC payment delinquencies were not cash flow related, but rather were occasioned by logistical problems, including centralization of administrative functions, understaffing in the department charged with addressing accounts payable, and the relatively small size of the vendor (NLS); (4) Matco and its affiliates (on a consolidated basis) were profitable; (5) Matco and its affiliates (on a consolidated basis) were rapidly growing; and (6) Davis, as treasurer of Matco, would furnish NLS with consolidated financial

---

[1] Davis stated in his deposition of September 13, 2002, that to his knowledge, James Matthews never received Russell's letter, and as was their practice, Davis would take care of such matters for Matthews without Matthews' knowledge.

statements for Matco and its affiliates within a period of a few weeks following the meeting.

At the end of the meeting, Davis gave Russell a check in the amount of $158,240.05, which reduced the outstanding balance owed to NLS from $495,685.65 to $337,445.60, and as a result of what had transpired, Russell agreed that NLS would continue to provide ABC the laminate components pursuant to their agreement.

At trial, Russell claimed that Davis failed to disclose during their meeting that Matco and its affiliates (including ABC): (1) had liabilities that vastly exceeded their assets; (2) had suffered millions of dollars in losses during the preceding three years; (3) were in rapid financial decline; (4) had negative working capital; (5) had almost no available cash; and (6) had, for the preceding four months, stood in default of a fifty million dollar line of credit that was secured by all of the companies' assets, including their inventory, cash, receivables and equipment; and that a Fourth Forbearance Agreement was due to expire on the day following the September 14 meeting.[2]

---

[2]During this time, Matco and its affiliates, including ABC, operated under a series of forbearance agreements with their lender, the National Bank of Canada. In essence, each agreement provided that the bank would forbear from foreclosing on Matco and its affiliates' assets in return for various commitments from Matco, ranging from paying fees to providing additional collateral to creating a new business plan. Each forbearance agreement had a set termination date and provided in bold language that there was to be no expectation that the bank had any obligation to enter into a new forbearance agreement upon expiration of the current agreement.

Unaware of this impending financial doom, after the September 14 meeting, NLS continued to extend credit to ABC.

2.      September 22 Letter from Davis to Russell

On September 22, 2000, as a follow-up to the September 14, 2000 meeting, Davis sent a letter from New York to NLS in New Hampshire, reiterating "[his] commitment to meet [NLS's] payment terms" and "assur[ing] [NLS] that Matco . . . stands behind this commitment and all confirmed obligations of ABC to NLS."  Davis then concluded the letter "if there is ever a[n] issue with payment, simply send me an e-mail . . . ."

On October 13, 2000, Matco's lender, National Bank of Canada, notified Davis via telephone (followed up by an October 17 faxed letter) that a subsequent Forbearance Agreement would not be renewed and that no further forbearance would take place.  Davis never notified NLS of the lender's intentions, and ABC continued to draw raw material from NLS's stock.  Then, an ABC check in the amount of $35,835.47, payable to the order of NLS and dated October 11, 2000, was returned to NLS unpaid with a "return to maker" stamp dated October 23, 2000.

3.      The E-mails

On October 31, 2000, Russell took Davis up on his invitation in the September 22 letter to send him an e-mail "if there is ever a[n] issue with payment . . . ."  In the e-mail, sent by Russell in New Hampshire to Davis in New York, Russell stated

that: "[c]urrently, we have not seen a check in three weeks and the last check we did receive has been returned to NLS with a 'return to maker' marking (our agreement calls for a weekly check paying all invoices 53 days old or older). Currently $215,717.57 is due through next Monday, including the amount of the check that has been returned." Russell went on to note that Davis' accounts payable staff had indicated to him that "Matco has encountered a problem with [its line of credit facility] and that this problem should be cleared up by the end of the week." Russell then asked that Davis update Russell on the "situation" and told Davis that he had "not yet received the financial statements that [Davis] agreed to forward following [the September 14] meeting."

On November 1, 2000, Davis responded to Russell in New Hampshire by an e-mail sent from New York. In that e-mail, Davis stated that "[a]bout two weeks ago, our Bank Group disallowed a substantial receivable, which backed us into an overadvance. They then began returning checks and to date have only allowed us to fund payroll. We are working very hard to correct this situation." He then stated "I assure you this situation was totally unexpected and we are doing everything possible to protect our suppliers."

Russell testified that as a result of this e-mail, he sent a memorandum by facsimile to Davis informing him that the consignment stock was not to be used and that it was to be returned

-7-

to NLS as soon as possible.[3]  The balance due to NLS upon termination of the consignment relationship was $669,946.46.

Subsequent to the termination of the consignment relationship, NLS did not receive any further payments from ABC or Matco on the past due amount, nor any explanation for the lack of payment from Davis.  NLS attempted on numerous occasions to telephone Davis with no success.  On November 10, 2000, NLS sent an e-mail from New Hampshire to Davis in New York, stating "[y]ou've ignored numerous telephone calls.  I would appreciate an update on Matco's situation positive or negative."

In response, Davis e-mailed that he had not intentionally ignored Russell's calls, and that he had "been working diligently on solutions."  He said that "[w]e have a consulting team now involved and our focus has been on our options, including equity, refinancing, etc.  We will be presenting our cash plan to our current bank group next week.  Hopefully they will free up advances to our vendors.  Again, we are trying to do all posible [sic] to protect our supplier/partners exposure."

## C.        The Proceedings

After receiving Davis' last e-mail, Russell testified that Davis' language, for the first time, suggested that Matco and

---

[3]Even though the facsimile memorandum terminating the consignment relationship is dated October 30, 2000, it is stamped as faxed on November 1, 2000.  Russell testified that he neglected to change the October 30 date from a previous correspondence.

ABC were in serious financial trouble. In response, NLS filed suit against Matco and ABC in Rockingham County New Hampshire Superior Court, and Matco removed the case to the District Court of New Hampshire. See Northern Laminate Sales, Inc. v. Matco Elecs. Group, Inc., Civil Action No. 00-cv-573. Chief Judge Barbadoro entered an order of judgment on February 20, 2001 in favor of NLS in the amount of $669,946.46 plus interest in accordance with a Stipulation for Judgment. ABC initially made installment payments to NLS pursuant to the judgment totaling $450,000, but then stopped making payments. On January 9, 2002, NLS commenced suit against Matco for the balance. See Northern Laminate Sales, Inc. v. Matco Elecs. Group, Inc., Civil Action No. 02-cv-8-JD. Matco failed to plead or otherwise defend the suit within the time permitted by Federal Rule of Civil Procedure 12(a)(1)(A) and a default judgment was entered against Matco. Matco did not make any payments on the judgment, and on February 13, 2002, several other Matco creditors filed an involuntary bankruptcy petition against Matco and its affiliates. In an attempt to collect the balance due from ABC, NLS filed the instant suit against Davis personally, alleging that NLS suffered its financial damages as a result of Davis' fraudulent and/or negligent misrepresentations concerning the creditworthiness

of Matco and ABC.[4]  Davis filed a motion to dismiss based on lack of personal jurisdiction, which the district court denied.

NLS's case against Davis went to a jury, which found for NLS on the fraudulent and negligent misrepresentation claims and awarded damages in the amount of $219,946.46.  This amount represents the difference between the amount due on the account at the time NLS stopped providing goods to ABC ($669,946.46) and the amount collected through the prior legal proceeding against Matco and ABC ($450,000).

Davis filed a motion for judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) or in the alternative for a new trial, pursuant to Federal Rule of Civil Procedure Rule 59.  The district court denied Davis' motion, and Davis filed this timely appeal claiming that the district court erred in finding jurisdiction over his person and that the jury incorrectly calculated the amount of damages.  We address each claim in turn.

## II.  PERSONAL JURISDICTION

Davis contends that the district court did not have jurisdiction over his person because the only relevant contact between himself, a New York resident, and New Hampshire, the

---

[4]In its complaint, NLS also alleged a violation of the New Hampshire Consumer Protection Statute, N.H. Rev. Stat. Ann. § 358-A.  The district court granted summary judgment to Davis on this claim, and NLS took no appeal from this ruling.

location of the suit, was the impact of the allegedly fraudulent misrepresentations he made during his September 14, 2000 meeting with Russell in New York.  Davis further argues that any other contacts between himself (in New York) and Russell (in New Hampshire) are "irrelevant" because these communications have no "nexus" with the fraud.[5]  Davis also claims that although he does not dispute the district court's choice of the prima facie method for determining jurisdiction at the pre-trial stage, after trial, the district court erred in not utilizing a preponderance of the evidence standard.  We review the district court's application of the prima facie standard de novo, <u>Foster-Miller, Inc.</u> v. <u>Babcock & Wilcox Canada</u>, 46 F.3d 138, 147 (1st Cir. 1995), and after a discussion of the relevant New Hampshire law on personal jurisdiction and the federal constitutional limitations on New Hampshire's exercise of that jurisdiction, we find that the district court correctly determined that it had personal jurisdiction over the defendant.

---

[5]Davis also argued below that he could not be held personally liable for his actions as a corporate officer under the fiduciary shield doctrine.  Although Davis does not make this argument on appeal with respect to the misrepresentations he made during the September 14, 2000 meeting, we pause briefly to note that the "general rule . . . is that an officer of a corporation 'is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority.'"  <u>Escude Cruz</u> v. <u>Ortho Pharm. Corp.</u>, 619 F.2d 902, 907 (1st Cir. 1980).  Here, as Davis personally participated in the alleged tortious activity, he is not protected by the fiduciary shield doctrine.

**A.       Method of Determining Personal Jurisdiction**

A district court, faced with a motion to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), "may choose from among several methods for determining whether the plaintiff has met [its] burden" of proving that court's personal jurisdiction over the defendant.  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50-51 (1st Cir. 2002).  The district court here chose the most common of these methods, the prima facie method, which "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction."  Foster-Miller, Inc., 46 F.3d at 145 (quoting Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)).  As noted above, at least with respect to the original motion to dismiss, the parties do not object to the district court's choice of the prima facie method.

1.       Davis' Post-Trial Motion Re: Jurisdiction

After the jury returned the verdict against Davis, Davis moved for a judgment notwithstanding the verdict, and in the alternative, for a new trial.  In this post-verdict motion, Davis "reraise[d] and incorporate[d] his previous arguments and memoranda setting forth his basis and argument for contesting the Court has personal jurisdiction." Davis offered no additional argumentation, and did not anywhere state that he was requesting the district

-12-

court review its jurisdictional determination in light of the fact that the jurisdictional evidence had changed as a result of findings made at trial. The district court treated this as a request to reconsider Davis' original motion to dismiss for lack of personal jurisdiction, and stated that it "believe[d] the analysis made in the order [denying Davis' motion to dismiss] was correct on the submissions made and [it would] not reconsider it." Davis contends on appeal that the judge's ruling during the trial for purposes of NLS' New Hampshire consumer protection claim that the September 22 letter was not "inextricably entwined" with the misrepresentations made during the September 14 meeting, rendered the letter "irrelevant" for jurisdictional purposes and thus there are insufficient contacts to establish jurisdiction in New Hampshire.[6] Davis made no such argument below.

---

[6]The district court, after noting Davis' argument that NLS "could not have been injured by Davis' November 2000 e-mails because any product that [NLS] sold to ABC after October 30, 2000 was on a C.O.D. basis . . . . [and therefore NLS] did not extend any additional credit based on the November 2000 e-mails," did not consider the e-mails for purposes of its jurisdictional analysis. The district court, as we do now, found Davis' alleged fraudulent misrepresentations during September 2000 sufficient for jurisdictional purposes without consideration of the November 2000 e-mails. We express no opinion on whether these e-mails could have been considered for jurisdictional purposes as evidence that Davis "contemplated future consequences" from his actions during the September 14, 2000 meeting and from his invitation in his September 22, 2000 letter to Russell to e-mail him "if there [was] ever a[n] issue with payment." See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 290 (1st Cir. 1999) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985)).

We begin by noting that "the denial of a motion to dismiss a complaint for a lack of jurisdiction over the defendant's person . . . is not a final adjudication and generally is not appealable" on an interlocutory basis. Charles Alan Wright and Arthur R. Miller, 5B Federal Practice and Procedure § 1351 (3d ed. 2004). And, "[a] party who has unsuccessfully raised an objection under Rule 12(b)(2) may proceed to trial on the merits without waiving the ability to renew the objection to the court's jurisdiction." Id. Thus, it is generally the case that where there has been an unsuccessful challenge to personal jurisdiction in a pre-trial motion, the losing party must wait until final judgment is entered before appealing the denial of the dismissal. See id.

When a party makes a motion post-trial re-alleging a lack of personal jurisdiction, the party may request, or the judge may determine on his own, to make the jurisdictional inquiry in light of the facts that were revealed at trial using a preponderance of the evidence standard. And, as we stated in Boit:

> Any standard the trial court applies, other than the prima facie standard, will to some extent involve weighing evidence to make findings (either under a preponderance or under a likelihood standard), exercising discretion, or both. Review of any findings or discretionary determination will be deferential rather than de novo. Of course, review of the district court's legal conclusion as to whether the findings support personal jurisdiction will be nondeferential.

967 F.2d at 678.

-14-

However, where, as here, the party simply requests the judge to revisit the judge's initial ruling on the pre-trial motion to dismiss for lack of personal jurisdiction, and makes no argument to the judge why the jurisdictional facts have changed as a result of the trial, the judge is not required to advance such argument for the moving party. The district court here treated Davis' perfunctory request to revisit the pre-trial motion as a motion for reconsideration and we find no error in that decision. Furthermore, it is not clear from the record that the district judge's ruling on the September 22 letter for purposes of the consumer protection claim had any bearing on the consideration of that letter for jurisdictional purposes. Therefore, in evaluating the district court's reasoning on the original motion to dismiss, we accept the court's choice of the prima facie method. See Daynard, 290 F.3d at 51.

2.      The Prima Facie Method

Under the prima facie method, the plaintiff has the burden of making a prima facie showing of personal jurisdiction over the defendant. Daynard, 290 F.3d at 51. In Daynard, we set forth the relevant analysis:

> We "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Foster-Miller, 46 F.3d at 145. We take these facts "as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law at Andover, Inc. v. Am.

> Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); see
> also Sawtelle v. Farrell, 70 F.3d 1381, 1385-86
> (1st Cir. 1995). "We then add to the mix facts put
> forward by the defendants, to the extent that they
> are uncontradicted." Mass Sch. of Law, 142 F.3d at
> 34.

290 F.3d at 51. We now turn to the relevant law on personal jurisdiction.

## B.        Background Law on Personal Jurisdiction

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 210, 204 (1st Cir. 1994)). "A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction." Mass. Sch. of Law, 142 F.3d at 34. "[A] defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999). Here, there is no claim that Davis engaged in "continuous and systematic" conduct with New Hampshire such that he is subject to the general jurisdiction of the New Hampshire courts.

In the absence of general jurisdiction, "a court still may hear a particular case if that case relates sufficiently to, or

arises from, a significant subset of contacts between the defendant and the forum." Id. This latter form of jurisdiction is referred to as "in personam" or "specific" jurisdiction. To establish in personam jurisdiction, NLS must show that the New Hampshire long-arm statute grants jurisdiction, and if it does, that the exercise of jurisdiction under the statute is consistent with the requirements of the Federal Constitution. See Daynard, 290 F.3d at 52.

1.        The New Hampshire Long Arm Statute

The New Hampshire long arm statute, N.H. Rev. Stat. Ann. 510:4(I), permits the exercise of personal jurisdiction over a nonresident defendant who, among other things, "commits a tortious act within this state." The New Hampshire Supreme Court has interpreted the New Hampshire long-arm statute as affording jurisdiction over foreign defendants "to the full extent that the statutory language and due process will allow." Sawtelle, 70 F.3d at 1388 (quoting Phelps v. Kingston, 536 A.2d 740, 742 (N.H. 1987)). And, even though Davis alleges that he did not commit any of the allegedly tortious conduct within New Hampshire's borders, "[i]t is settled New Hampshire law that a party commits, for jurisdictional purposes, a tortious act within the state when injury occurs in New Hampshire even if the injury is the result of acts outside the state." Hugel v. McNell, 886 F.2d 1, 3 (1st Cir. 1989). Thus, having satisfied the requirements of the New

Hampshire long-arm statute, our inquiry now turns to the question of whether the exercise of jurisdiction over Davis in New Hampshire violates the Federal Constitution.

2.        The Federal Constitution

The Due Process Clause of the Fourteenth Amendment to the United States Constitution "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co., 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). This circuit divides this minimum contacts analysis into three inquiries: relatedness, purposeful availment, and reasonableness. See Daynard, 290 F.3d at 60.

a.    Relatedness

To satisfy the relatedness requirement, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992). As we

-18-

noted in <u>Pritzker</u> v. <u>Yari</u>, 42 F.3d 53, 61 (1st Cir. 1994), the relatedness test is a "flexible, relaxed standard."

NLS' case presents two concerns with respect to relatedness: first, did Davis engage in any forum state activity and second, whether NLS' injuries "arise out of" or "relate to" Davis' in-forum activities. With respect to the former issue, Davis alleges that he did not engage in any activity in New Hampshire. Davis points out that he met with Russell in New York, not in New Hampshire, and that Davis "had not stepped foot in New Hampshire for over ten years." But, a defendant need not be physically present in the forum state to cause injury (and thus "activity" for jurisdictional purposes) in the forum state. <u>See, e.g.</u>, <u>Calder</u> v. <u>Jones</u>, 465 U.S. 783, 789 (1984) (finding jurisdiction over petitioners proper in California based on the "effects" of their Florida conduct in California).

Having satisfied the threshold question of whether NLS' injury in New Hampshire incurred as a result of Davis' alleged tortious activity in New York could provide the basis for jurisdiction in New Hampshire, the second concern, that NLS' injuries relate to that activity, is easily satisfied. NLS would not have extended further credit to ABC but for Davis' misrepresentations during the September 14, 2000 meeting, and NLS' injury is a direct result of this extension of credit.

-19-

b.        Purposeful availment

To satisfy the second requirement, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." United Elec. Workers, 960 F.2d at 1089. The focus in this second requirement is on "voluntariness and foreseeability." Sawtelle, 70 F.3d at 1391. Here, even though it was Russell who requested a meeting with James F. Matthews, the president and sole shareholder of Matco, ABC, and the other Matco affiliates, it was Davis who contacted Russell and invited Russell to meet with Davis in New York. And Davis, knowing full well that his statements would induce NLS' reliance, made misrepresentations in the face of the knowledge that his statements would likely cause financial injury to NLS in New Hampshire. We find this sufficient to make it foreseeable to Davis that he might be held accountable for his misrepresentations in a New Hampshire forum. See Hugel, 886 F.2d at 4 ("The knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions.").

c.        Reasonableness

Lastly, the third requirement is that the exercise of jurisdiction must be reasonable, United Elec. Workers, 960 F.2d at 1089, and to guide us in the evaluation of reasonableness, the Supreme Court has provided a set of "gestalt factors" to consider, see World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).  These gestalt factors include:  the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the  interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies.  Burger King Corp., 471 U.S. at 477.  The factors favoring litigating this dispute in New Hampshire include New Hampshire's interest in redressing harms against its citizens, NLS' interest in obtaining convenient and effective relief from a court in its own state, and that the efficient administration of justice would be served given the district court's familiarity with New Hampshire law that governs the dispute.  The only possible gestalt factor that could turn in Davis' favor is the defendant's burden of appearing, and Davis presents no argument why the burden of defending a suit in New Hampshire from New York outweighs the factors favoring New Hampshire.  See Pritzker, 42 F.3d at 64 ("[I]nsofar as staging a

-21-

defense in a foreign jurisdiction is almost always inconvenient and/or costly, we think this factor is only meaningful where a party can demonstrate some kind of special or unusual burden.").

Therefore, the district court correctly determined that subjecting Davis to the jurisdiction of the courts of New Hampshire would not violate the Federal Constitution.

### III.  DAMAGES

We next turn to Davis' second contention on appeal--that the jury miscalculated its award of damages, and thus the district judge incorrectly denied his motion for a judgment notwithstanding the verdict or in the alternative for a new trial.

We review the denial of Davis' motion for judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b) de novo.  See Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002).  "Our review is weighted toward preservation of the jury verdict; we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them."  Id. at 41-42 (internal quotation and alteration omitted).  We must affirm "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment."  Sheils Title Co. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1st Cir. 1999).

We review a denial of a motion for a new trial under an abuse of discretion standard, and "there is no abuse of discretion unless the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." Id. (quotation omitted).

In his post-trial motion, Davis alleged that NLS failed to prove legally sustainable damages and that the amount awarded to NLS by the jury did not equate to the damages proximately caused by Davis' misrepresentations. The district court, in denying Davis' motion, determined that:

> There was evidence and inferences from which the jury could reasonably conclude that plaintiff extended its credit to the sum of $669,946.46 because of [Davis'] misrepresentations. Defendant provided representations that his employer's companies were profitable, in a good financial position. He withheld the overall unprofitability of the companies, the numerous and extensive defaults on credit agreements, the negative working capital and the severe cash crunch. There was ample evidence from which a reasonable jury could find that Mr. Davis' misrepresentations caused plaintiff to extend substantial additional credit which, after the deduction of the $450,000 paid on a prior corporate settlement resulted in the loss found by the jury. The plaintiff's verdict in this regard is supported by the weight of the credible evidence.

On appeal, Davis makes essentially the same arguments. Principally, Davis claims that the base number in calculating NLS' pecuniary loss as a result of Davis' misrepresentation should be the amount owed by ABC to NLS at the time Davis made the misrepresentation (i.e., $495,685.65). Davis' reasoning is that NLS presented no evidence that if the consignment arrangement had

terminated on September 14, 2000, NLS would have been successful in collecting that whole amount from ABC. We find it reasonable, however, for the jury to infer from the facts presented at trial that NLS would have been successful: Russell testified that if Davis had told the truth at the September 14 meeting, he would have "cut and run"; that is, he would have stopped extending credit to ABC, pulled his consignment stock out of the ABC facility, and would have taken measures to collect on ABC's debt. See Brown-Wales, Co. v. Barber, 184 A. 855, 859 (N.H. 1936) (finding plaintiff's statement that he would have "shut [the defaulting company] off entirely" and that he would have "closed the account" but for the defendant's misrepresentation justified the court's finding that the plaintiff, had it known the true facts, would not only have ceased to extend further credit after that time, but also would have made some attempt to collect the debts then due). Moreover, it was also reasonable for the jury to infer that NLS would have been successful in recovering the whole $495,685.65 from the fact that NLS was later successful in collecting $450,000 prior to Matco's involuntary bankruptcy, that ABC and Matco were in business for some time after the September 14, 2000 meeting, and that ABC made substantial payments to NLS for COD goods during that time. See id. (finding that it may be inferred that the plaintiff's collection efforts would have resulted in complete success from the fact that the defaulting company was paying its

-24-

debts at the time the defendant made its misrepresentations and that the company continued in business for a year later, making substantial payments to the plaintiff during that time).

We find the jury's calculation of damages to be supported by the evidence.

## IV. CONCLUSION

For the reasons stated above, the decision of the district court is **AFFIRMED.**