# United States Court of Appeals
## For the First Circuit

No. 12-1338

BLUETARP FINANCIAL, INC.,

Plaintiff, Appellant,

v.

MATRIX CONSTRUCTION CO., INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

Gavin G. McCarthy, with whom Pierce Atwood LLP was on brief, for appellant.
Jason P. Donovan, with whom Daniel R. Mawhinney and Thompson & Bowie, LLP were on brief, for appellee.

March 1, 2013

**THOMPSON**, <u>Circuit Judge</u>.  The sole question presented on appeal is whether the district court has personal jurisdiction over the defendant.  The district court did not think it did and so dismissed the complaint.  After carefully considering the matter, we find the requirements for personal jurisdiction have been satisfied and we reverse.

## FACTUAL BACKGROUND

The defendant Matrix Construction Co., Inc. ("Matrix"), as the name suggests, is in the construction business.  It is a South Carolina corporation with its principal place of business in Anderson, South Carolina.  In 2010, it was hired as the general contractor for a project involving renovations to three schools in Anderson.  In connection with the project, Matrix solicited bids from building supply companies.  Contract Supply, LLC ("Contract Supply"), a South Carolina company with its principal place of business in Mauldin, South Carolina, submitted a bid to supply hollow metal frames and wooden doors.  Matrix accepted the bid; the quoted price was around $150,000.

At the time, Contract Supply had a relationship with the plaintiff BlueTarp Financial, Inc. ("BlueTarp"), a company that provides commercial credit to the construction industry.  BlueTarp is a Delaware corporation with its principal place of business in

Portland, Maine.[1]  BlueTarp and Contract Supply had entered into a contract whereby Contract Supply agreed to provide a BlueTarp credit application to the contractors it worked with instead of extending its own in-house credit.  And so, after its bid had been accepted, Contract Supply faxed Matrix a BlueTarp credit application.  The attached fax cover sheet read: "Could you please complete the following credit app?  We need to get your company set up in our system so we can get started on the shop drawings for the 2 Anderson elementary schools."

The credit application, which called for various bits of information about the applicant company, indicated that upon completion it could be returned to the materials dealer (here Contract Supply), or to BlueTarp via a toll free fax number, email, or by mail to a P.O. Box in Portland, Maine.  The application also contained a second page titled "BlueTarp Financial Account

---

[1] According to BlueTarp, its principal place of business is in Portland, Maine and its corporate office is in Charlotte, North Carolina. Matrix, however, is not convinced that Maine is in fact the principal office.  It points to some of BlueTarp's filings with various states, including North Carolina, that list the Charlotte, North Carolina office as being either the "principal executive office," "main business address," "corporate officers' address," or "principal office address."  For our purposes, applying the plaintiff-friendly prima facie standard (explained later), BlueTarp has adequately established that its principal place of business is in Maine.  There is evidence that forty-three of its fifty-three employees work in the Maine office, including three-quarters of the managerial level staff.  All purchase authorizations, customer records, billing, communications, and collection efforts go through the Maine office.  BlueTarp's filings with the Maine Secretary of State, and its filing with the U.S. Securities and Exchange Commission, list its principal office as being in Portland, Maine.

Agreement" (the "account agreement"), which laid out the terms and conditions of the credit relationship. The account agreement listed BlueTarp's address as 443 Congress Street in Portland, Maine. It also provided that the agreement would be governed by the "laws of the State of Maine" and that in the event of default "BlueTarp may institute suit against you in the courts of the State of Maine, regardless of where you are geographically located or conduct business." The account agreement further indicated that Matrix's use of its BlueTarp account would constitute acceptance of the agreement's terms and conditions, and that Matrix agreed to be bound by the account agreement in the event its application was approved.

Matrix says its policy was to pay for building materials by check whenever possible and, when credit was needed, to use the line of credit it had with a bank. Nonetheless, to avoid any delays, Matrix's office manager completed and signed the credit application. However, she left the requested credit line blank because, according to Matrix, it did not intend to purchase anything using the credit. The application was faxed to Contract Supply in South Carolina.

Contract Supply forwarded the application to BlueTarp, which denied it because the application was not signed by a Matrix corporate officer and because the requested credit line was left blank. On May 24, 2010, BlueTarp sent a fax to Matrix indicating

that it could not process the credit application for those reasons. The fax directed Matrix to resubmit its application to BlueTarp via fax. One of BlueTarp's employees followed up with Matrix during the ensuing week by phone and fax asking for a completed application.

On June 2, Matrix submitted a new application, again containing the account agreement on the second page. This one was signed by Matrix's president, H.M. King, Jr., with a requested credit line of $5,000 (an intentionally limited amount because, again, Matrix says it never intended to use the credit). Using BlueTarp's toll free fax number, Matrix faxed the application to BlueTarp's office in Portland, Maine. The application was approved that day. On or around June 8, 2010, BlueTarp sent Matrix a welcome letter. The letter, which listed BlueTarp's address as being in Maine, indicated that Matrix's initial credit limit was $10,000 and it provided billing, payment, and online account set-up information including an account number, sign-on password, and a purchaser identification number. The second page of the letter was another copy of the account agreement.

Right around this time, on June 6, 2010, Matrix submitted its first purchase order to Contract Supply, a $44,134.00 order. A $51,078.92 order followed on January 14, 2011 and then a $71,880.40 order on May 5, 2011. Contract Supply billed Matrix for the ordered materials directly, sending a little more than twenty

invoices from September 2010 to May 2011. Contract Supply's name and its South Carolina address were listed at the top of each invoice. Under a box labeled "Terms" on the invoices it said "BlueTarp." Then at the bottom of each invoice it said "BlueTarp Customers Only Please Remit to BlueTarp Financial, Inc." and it provided a P.O. Box located in Atlanta, Georgia.

At the same time, BlueTarp was also billing Matrix from its Maine office. It was doing this because it was advancing Contract Supply money as payment for Matrix's purchases. Specifically, from July 2010 to May 2011, BlueTarp approved $169,217.58 in charges made on Matrix's BlueTarp credit account. And so from July 2010 to June 2011, BlueTarp sent Matrix a billing statement once a month (twelve total). On the billing statements BlueTarp's address was listed as the P.O. Box in Atlanta, Georgia. The statements contained Matrix's customer account number, account summary, account balance, a list of its purchase transactions, its available credit, and credit limit, among other things. The first bill reflected Matrix's credit limit as being $10,000. After a couple of months this climbed to $50,000 and eventually up to a high of $144,000. Matrix says it never requested or discussed this increase with BlueTarp.

Matrix elected to pay Contract Supply directly for the materials. From September 2010 to April 2011 Matrix sent checks to Contract Supply in South Carolina. Matrix sent eleven checks,

the payments totaling about $50,500. Matrix never made any payments to BlueTarp. However, apparently unbeknownst to Matrix, Contract Supply was forwarding the checks to BlueTarp. Contract Supply was sending the checks to a bank lockbox that BlueTarp maintained - this was the Georgia P.O. Box.[2] The bank would take the checks directly from this lockbox and deposit them, regardless of who was listed as payee, into BlueTarp's account. According to BlueTarp, because of this arrangement it never saw the checks and therefore never knew that Matrix was "improperly" making the checks out to Contract Supply.

During this time (June 2010 to June 2011 to be exact) Matrix and BlueTarp were intermittently communicating on the phone and by email. Based on the communication logs that BlueTarp kept and an accompanying affidavit, it appears there was in the vicinity of fifteen calls or emails, all of which went through BlueTarp's Maine office. The bulk of the communications originated from BlueTarp. There were, however, a couple of emails sent from Matrix's office manager to BlueTarp; both times she was responding to a communication from BlueTarp.

In June 2011, Matrix learned that Contract Supply was not paying its suppliers. As a result, Matrix stopped paying Contract Supply. It says it did this on the advice of legal counsel to protect against the risk of double payment to Contract Supply and

---

[2] One check was sent directly to BlueTarp and not the lockbox.

its suppliers under South Carolina law. On June 15, 2011, a collections manager from BlueTarp sent Matrix a letter. In it, BlueTarp conceded that Contract Supply had not paid some of its suppliers. It went on to say that if Matrix was considering paying the bilked suppliers directly, such payment would not relieve it of its obligations to BlueTarp. The letter continued by indicating that BlueTarp had paid Contract Supply in full for all of Matrix's purchases and therefore Matrix owed BlueTarp a balance of $118,201.50.[3] Matrix ignored the payment request.

## PROCEDURAL BACKGROUND

In July 2011, BlueTarp filed this lawsuit in the United States District Court for the District of Maine invoking diversity jurisdiction. See 28 U.S.C. § 1332(a)(1). The complaint, which included a breach of contract claim and an unjust enrichment/equitable indemnity claim, alleged that Matrix owed BlueTarp $121,708.80 for unpaid purchases and interest. Matrix, the following month, turned around and filed its own lawsuit. It sued BlueTarp, Contract Supply, and two of Contract Supply's suppliers in South Carolina state court. The gist of the claim was that Matrix had never accessed its BlueTarp credit and that it was Contract Supply, not Matrix, who owed BlueTarp money.

---

[3] Matrix had paid in full all of its charges up to May 2011. The roughly $118,000 was the amount due in June and July.

Motion practice followed shortly behind the complaints. First, BlueTarp moved to dismiss the South Carolina case under South Carolina Rule of Civil Procedure 12(b)(8) on the basis that its earlier filed lawsuit in Maine involved the same parties and claims. A week or so later Matrix moved to dismiss the Maine case on the following grounds: lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, forum non conveniens, and failure of the unjust enrichment/equitable indemnity claim as a matter of law.

The South Carolina decision issued first. The court stayed the case pending the district court of Maine's resolution of Matrix's motion to dismiss. If jurisdiction was found in Maine, the South Carolina court said it would dismiss Matrix's complaint; if not, it would allow the case to go forward.

The federal district court of Maine's decision followed. It granted the motion to dismiss holding that it lacked personal jurisdiction over Matrix. It started by saying that the forum selection clause in the account agreement permitted BlueTarp to file suit in the state courts of Maine but did not require it. It then turned to the question of personal jurisdiction, noting first that general jurisdiction clearly did not exist and that the operative question was whether there was specific jurisdiction. In deciding that the answer was no, the court reviewed Matrix's contacts with Maine and in essence decided that they were too

tenuous to establish jurisdiction. Because it found personal jurisdiction lacking, the court did not analyze the other grounds that Matrix advanced to support dismissal. In a footnote, the court did however note that BlueTarp had established a basis for subject matter jurisdiction because it was not clear to any legal certainty that BlueTarp's claims were worth less than the $75,000 required for diversity jurisdiction.[4]

BlueTarp appealed the grant of the motion to dismiss to this court. On appeal, it argues that the forum selection clause itself authorizes jurisdiction in the Maine district court and, in the event we disagree with that proposition, that Matrix had sufficient connections with Maine to satisfy the requirements of personal jurisdiction. Matrix as would be expected takes the opposite position on both issues.[5]

---

[4] As promised, after this decision issued, the South Carolina state court lifted the stay. As of the time of briefing before this court, the South Carolina case was in the discovery phase. Also, though there is nothing in the record about this, Matrix indicates in its brief that yet another case entered the fray around this time. Specifically, after the dismissal below, BlueTarp sued Matrix, in a cause of action nearly identical to this one, in Maine state court. We take judicial notice that neither the South Carolina state-court case or the Maine state-court case has gone to final judgment.

[5] Matrix makes alternative arguments in favor of dismissal, the same ones it advanced below: improper venue, forum non conveniens, and a legally deficient unjust enrichment/equitable indemnity claim. Though these arguments were never considered by the district court, Matrix urges us to affirm the dismissal on these grounds. We decline to do so.

Additionally, Matrix contends that the district court's

**STANDARD OF REVIEW**

When a district court reviews a motion to dismiss under the prima facie standard, which is what it did here, our review is de novo.[6] Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005); Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 147 (1st Cir. 1995). Under this prima facie standard, "the inquiry is whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008). The plaintiff's properly documented evidentiary proffers are accepted as true for purposes of making the prima facie showing, and we construe these proffers in a light

---

finding of subject matter jurisdiction (made in passing) was erroneous. We disagree. It is undisputed that the two parties are citizens of different states. See 28 U.S.C. § 1332(a). As for the amount in controversy, it is not obvious that the claim involves less than the requisite $75,000. See id. BlueTarp's Vice President of Credit Risk Management completed an affidavit, which indicates that Matrix did not pay approximately $118,000 in charges or the resulting late fees and interest. This amount matches up with BlueTarp's billing statements and its collections letter. Moreover, Matrix admits it stopped paying. While Matrix may ultimately be able to argue that BlueTarp should not prevail because Matrix never paid BlueTarp directly or authorized the credit increase, at this stage it is not apparent to a legal certainty that BlueTarp cannot recover the approximately $120,000 it claimed. See St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938); Stewart v. Tupperware Corp., 356 F.3d 335, 338 (1st Cir. 2004).

[6] In addition to the prima facie method, courts can apply the preponderance method or the likelihood method, both of which typically require an evidentiary hearing. Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 n.2 (1st Cir. 2008).

-11-

most favorable to plaintiff's jurisdictional claim.  Id.  To the extent that they are uncontradicted, we add into the mix the facts put forward by the defendant.  Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 31 (1st Cir. 2010).  The ultimate burden of persuasion is on the plaintiff.  Id.

**ANALYSIS**

In order to subject a defendant who is not present in the forum state to a personal judgment, the Due Process Clause requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).  Personal jurisdiction over a defendant can come in the form of general or specific jurisdiction.  Harlow, 432 F.3d at 57.  For general jurisdiction the defendant must have continuous and systematic contacts with the forum state, but the particular cause of action may be unrelated to those contacts.  Id.  General jurisdiction "broadly subjects the defendant to suit in the forum state's courts in respect to all matters," regardless of whether the matter before the court has anything to do with the defendant's contacts with the state.  Cossaboon, 600 F.3d at 31 (internal quotation marks omitted).  In this way general jurisdiction is different than specific jurisdiction because specific jurisdiction depends on an "affiliatio[n] between the forum and the underlying

-12-

controversy." Goodyear Dunlop Tire Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011) (internal quotation marks omitted) (alteration in original); see Harlow, 432 F.3d at 57 (holding that "[f]or specific jurisdiction, the plaintiff's claim must be related to the defendant's contacts"). There is no claim of general jurisdiction here; only specific jurisdiction is at issue.

Courts may assert specific jurisdiction over a defendant when it is permissible under both the forum state's long-arm statute and the Due Process Clause of the United States Constitution. Carreras v. PMG Collins, LLC, 660 F.3d 549, 552 (1st Cir. 2011). Maine's long arm statute extends to the fullest extent permitted by the Due Process Clause of the Constitution, Me. Rev. Stat. tit. 14, § 704-A(1); Harlow, 432 F.3d at 57, and so we turn directly to the constitutional analysis. Specific jurisdiction analysis under the Due Process Clause has three distinct components: relatedness, purposeful availment, and reasonableness. Phillips, 530 F.3d at 27. An affirmative finding on each of these elements is needed to support a specific jurisdiction finding. Negrón-Torres v. Verizon Communications, Inc., 478 F.3d 19, 24-25 (1st Cir. 2007).

### i. Relatedness

To satisfy the relatedness prong, the cause of action must arise from or relate to the defendant's contacts with the forum state. Carreras, 660 F.3d at 554; Phillips, 530 F.3d at 27.

-13-

A consideration in a contract action such as this is whether the defendant's forum-based activity was instrumental in the contract's formation or breach.  Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007).   Inferences can be drawn from the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 135 (1st Cir. 2006) (internal quotation marks omitted).

BlueTarp filed suit because Matrix allegedly owes it money based on a relationship that was formed when Matrix sent the completed credit application (containing the account agreement) to BlueTarp in Maine.  Before this formation there was some back and forth.  First, Matrix's office manager completed the application leaving the credit line blank.  When BlueTarp declined this offer, the application apparently went up the corporate food chain to Matrix's president, King, who completed and signed the application with the requested credit amount and sent it off to Maine. Sending the application to Maine, the culmination of this back and forth negotiation, resulted in the formation of the contract and relationship at issue.[7]   See, e.g., Phillips, 530 F.3d at 27

---

[7] Matrix does not claim that it is not bound by the account agreement's terms, nor does it appear that such an argument would have merit.  There is no allegation that King did not have the authority to enter into the agreement and indeed, as Matrix's president, we think it safe to assume he did.  The language of the agreement itself indicated that approval of the application meant that Matrix was bound by the account agreement and Matrix's use of

-14-

(explaining that one factor that typically leads to a relatedness finding is when an employment contract's specific terms "were 'formalized and entered into' in the forum state" (quoting Adelson, 510 F.3d at 49)).

Besides Maine playing a role in the agreement's negotiation and formation, the resulting relationship contemplated the future consequences of Matrix using the credit account and thus continuing to interact with BlueTarp in Maine. These ramifications would be bills issuing from Maine, employees in Maine keeping track of Matrix's purchases and balance, Maine employees making decisions regarding credit adjustments and limits, and Matrix communicating with those employees to address any issues that arose (in essence, to the extent permitted by the account agreement, BlueTarp became Matrix's payment agent). And, as evidenced by the billing statements and phone and email communications between the parties, just such interplay did take place.

Matrix, however, tries to put distance between it and BlueTarp, emphasizing that it never placed orders with, or made payments directly to, BlueTarp. While this is true, Matrix did receive bills from Contract Supply that said Matrix's payment terms were "BlueTarp" and that directed BlueTarp customers to pay BlueTarp directly. And Matrix not only received a welcome letter

---

its BlueTarp account (which Matrix did use) constituted acceptance of its terms and conditions.

from BlueTarp but it also received twelve billing statements from BlueTarp containing Matrix's own assigned customer account number and demanding payment. If these facts alone do not serve to convince that Matrix was a BlueTarp customer, and that the parties were proceeding as such, the account breakdown on the billing statements makes clear that BlueTarp was handling Matrix's payments, extending Matrix credit, and keeping track of Matrix's purchases and use of the credit. Matrix received these BlueTarp billing statements monthly for a year, putting Matrix on notice that BlueTarp was performing its bargained-for obligations under the agreement. Given this monthly reminder, pursuant to the contractual relationship between the parties, Matrix had a right to call up BlueTarp at any time and contest the accuracy of the billing. Further, under the contract, Matrix (who in fact was communicating with BlueTarp throughout the year) had the express right to terminate the agreement.[8] But it never did. Matrix's present attempt to disassociate itself from BlueTarp is belied by its course of conduct and comes too late.

On top of everything else, the very terms of the account agreement indicated that it would be governed by the laws of Maine and that Matrix may be sued in the courts of the state of Maine.[9]

---

[8] The account agreement read: "Either [Matrix] or BlueTarp Financial may terminate this Agreement at any time."

[9] As we mentioned earlier, BlueTarp argues that this forum selection clause (which to remind the reader provided that

Thus the state of Maine was tied to the contract's terms, as well as the parties' interactions and contemplated future consequences, including the Maine court system's anticipated involvement in the resolution of any breach.

Given all this, we find this cause of action arises out of Matrix's Maine contacts.  See, e.g., Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 10 (1st Cir. 2009) (a contract's choice of law and consent to jurisdiction provisions were some of the Rhode Island connections the court found sufficient to satisfy the relatedness prong); Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 61 (1st Cir. 2002) (finding relatedness when suit arose out of Massachusetts activities that were instrumental in the contract's formation, including partial performance of the agreement in Massachusetts along with contemplated ongoing interaction with the state).  Most notably, faxing the credit application to Maine is what created the contract that BlueTarp claims was breached.[10]  See, e.g., Carreras, 660 F.3d

---

"BlueTarp may institute suit against you in the courts of the State of Maine,") in and of itself authorizes the district court's jurisdiction.  It contends that the clause means that Matrix consented to being sued both in Maine state court and the federal district court of Maine when it is sitting in diversity jurisdiction.  Matrix, on the other hand, along with the district court, thinks the clause refers only to Maine state courts.  We express no opinion on this disputed point.  For present purposes, it suffices for us to consider the forum selection clause as a factor in our jurisdictional analysis.

[10] Matrix makes much ado of the fact that Contract Supply's and BlueTarp's billing statements directed Matrix to send payment to

at 554-55 (holding that the mailing of purchase agreements to Puerto Rico "played a direct role in the formation of the purchase agreements at issue" and therefore was "'related' to the dispute").

### ii. Purposeful Availment

Specific jurisdiction further requires that the defendant's contacts "represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's presence before the state's courts foreseeable." Hannon v. Beard, 524 F.3d 275, 284 (1st Cir. 2008) (internal quotation marks omitted). We have called it akin to a "rough quid pro quo," that is, "when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior." Carreras, 660 F.3d at 555. In the purposeful availment inquiry the focus is on the defendant's intentions, id., and the cornerstones are voluntariness and foreseeability, Hannon, 524 F.3d at 284. The defendant's contacts

---

BlueTarp at a P.O. Box in Georgia. We do not think this fact is very significant. Companies undoubtedly often use out of state banks and may cut out the middleman by having customers send payments to the bank directly. Even were we to accept Matrix's argument that because the payments were due in Georgia, the breach necessarily occurred in Georgia, this would not change our thinking. Where the breach occurred is just one consideration and, as we explained, the other factors, including where the contract was formed and where the parties interacted, favor jurisdiction in Maine.

"must be deliberate, and not based on the unilateral actions of another party." Phillips, 530 F.3d at 28 (internal quotation marks omitted).

Matrix would have us believe that it was sheer chance it ended up dealing with a Maine company and that it never deliberately targeted Maine. However, Matrix's contacts with Maine were voluntary to the extent that it knowingly entered into a credit relationship with a company that it knew (it was clear on the account agreement's face) was located in Maine and it voluntarily sent the completed agreement to Maine. Though Matrix alleges that when it entered into the contract it did not intend to use the credit and it was simply complying with a precondition of doing business with Contract Supply, this does not change things. Regardless of whether Contract Supply required all suppliers to work with BlueTarp, or whether, as BlueTarp suggests, only customers who wanted to buy on credit had to fill out the application, Matrix voluntarily completed the application. It did not refuse or try to negotiate around it.

Of course simply entering into a contract with a company in the forum state does not automatically establish the requisite contacts, Adams v. Adams, 601 F.3d 1, 7 (1st Cir. 2010), but here we have more. First, as we outlined above in our relatedness analysis, the record makes clear that Matrix not only contracted with a Maine entity but that it followed through with the

-19-

contract's expectations and actually used BlueTarp's services. Matrix's contacts with Maine were deliberate and ongoing rather than simply founded on the one-sided actions of BlueTarp. See Phillips, 530 F.3d at 28. Second (and very significantly), based on the choice of law provision and the forum selection clause, it was eminently foreseeable that Matrix would be held accountable for any breach in Maine's courts. Compare Burger King Corp. v. Rudzewicz, 471 U.S. 462, 482 (1985) (finding that a choice of law provision, combined with the defendant's relationship with the forum, reinforced the defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"), with Adams, 601 F.3d at 8 (noting that the absence of a choice of law provision in a promissory note weighed against a finding that the defendant had purposefully availed himself of the benefits and protections of Massachusetts law). This all leaves us convinced that Matrix's contacts with Maine "were not random, isolated or fortuitous." Hannon, 524 F.3d at 284 (internal quotation marks omitted).

### iii. Reasonableness

The final piece of the puzzle is that an exercise of jurisdiction must be reasonable, in other words, consistent with principles of justice and fair play. Carreras, 660 F.3d at 554; Phillips, 530 F.3d at 27. A set of "gestalt factors" guides us in making this determination. N. Laminate Sales, Inc. v. Davis, 403

-20-

F.3d 14, 26 (1st Cir. 2005). These factors include: Matrix's burden of appearing, the forum state's interest in adjudicating the dispute, BlueTarp's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficient resolution of the matter, and the common interests of all states in promoting substantive social policies. See Adelson v. Hananel, 652 F.3d 75, 83 (1st Cir. 2011); N. Laminate Sales, Inc., 403 F.3d at 26 (citing Burger King Corp., 471 U.S. at 477).

Weighing the factors, the balance here tips in favor of jurisdiction. First, mounting an out-of-state defense most always means added trouble and cost and therefore, "'this factor is only meaningful where a party can demonstrate some kind of special or unusual burden.'" Hannon, 524 F.3d at 285 (quoting Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994)). No particular or unique burden has been shown here.

Second, Maine has an interest in this matter's resolution. BlueTarp, through its principal place of business, conducts business in Maine. Maine has an interest in redressing harms committed against its companies by out-of-state companies, see N. Laminate Sales, Inc., 403 F.3d at 26, the interest here being to ensure that an out-of-state entity settles up its supposed debts. Along these same lines, Maine has a stake in being able to provide a convenient forum for its slighted residents. See Adelson, 510 F.3d at 51.

-21-

Also cutting in favor of jurisdiction is BlueTarp's interest in convenient and effective relief. We have repeatedly said, "'a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.'" Hannon, 524 F.3d at 285 (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995)). Further, according to BlueTarp, all relevant documents and potential witnesses are located in Maine.

Fourth, given that there is a lawsuit in South Carolina state court involving this matter, there is at least a question as to whether the instant lawsuit serves the interstate judicial system's interest in efficient resolution. But the existence of the South Carolina lawsuit, which we note was filed after this one, is insufficient to tip the constitutional balance. See Adelson, 652 F.3d at 84. Concluding with the final factor, we see no substantive social policy at issue here.

The district court's exercise of jurisdiction over this matter is reasonable.

## CONCLUSION

Having found the relatedness, purposeful availment, and reasonableness factors satisfied, we conclude that it has been established that the district court has personal jurisdiction over

Matrix.   The district court's dismissal of the complaint is reversed.[11]

_____

[11] Our holding does not preclude the district court from transferring this case to another venue should it think it advisable.  Pursuant to 28 U.S.C. § 1404(a), a district court may transfer a case to any other district or division where the case might have been originally brought, or to which the parties have consented, in the interest of justice or for the convenience of the parties and witnesses.