# United States Court of Appeals
## For the First Circuit

No. 08-2334

ASTRO-MED, INC.,

Plaintiff, Appellee,

v.

NIHON KOHDEN AMERICA, INC. AND KEVIN PLANT,

Defendants, Appellants.

No. 08-2335

ASTRO-MED, INC.,

Plaintiff, Appellee,

v.

NIHON KOHDEN AMERICA, INC. AND KEVIN PLANT,

Defendants,

and

BRUCE W. GLADSTONE, ESQ. AND
E.P. MICHAEL KARCIS, ESQ.,

Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lipez and Howard, <u>Circuit Judges</u>,

and Woodcock[*], <u>District Judge</u>.

---

    <u>E.P. Michael Karcis</u> with whom <u>Mark A. McLean</u>, <u>McLean & McLean LLP</u>, <u>Bruce W. Gladstone</u>, and <u>Cameron & Mittleman LLP</u> were on brief for appellants.
    <u>Stacey P. Nakasian</u> with whom <u>Duffy & Sweeney, Ltd.</u>, <u>Craig M. Scott</u>, and <u>Scott & Bush, Ltd.</u> were on brief for appellee.

---

October 22, 2009

---

[*] Of the District of Maine, sitting by designation.

- 2 -

**WOODCOCK, District Judge.** Astro-Med, Inc. (Astro-Med) and Nihon Kohden America, Inc. (Nihon Kohden) are rivals in the highly competitive life sciences equipment market, and in October 2006, when Nihon Kohden hired away Kevin Plant, a valuable Astro-Med employee, Astro-Med reviewed its legal options. When first hired at Astro-Med in 2002, Plant signed an employee agreement that contained non-competition and non-disclosure provisions. Relying in large part on those provisions, in December 2006, Astro-Med filed suit against Plant alleging breach of contract and misappropriation of trade secrets. Astro-Med later added a third claim of unfair competition against Plant and joined Nihon Kohden as a defendant, against whom it alleged claims of tortious interference and misappropriation of trade secrets.[1] The lawsuit was especially hard-fought, and Nihon Kohden and Plant were disappointed on April 7, 2008, when a jury returned a verdict against them, awarding $375,800 in damages in favor of Astro-Med. Following the verdict, on July 25, 2008, the district court awarded exemplary damages against Nihon Kohden and Plant in the amount of $560,000, added an award of attorney's fees and costs, and imposed a sanction pursuant to Federal Rule of Civil Procedure 37. All told, the judgment against Nihon Kohden and Plant equals

---

[1]Astro-Med originally filed suit in Kent County Superior Court in Rhode Island. Asserting diversity jurisdiction, Plant timely removed the case to the United States District Court for the District of Rhode Island.

$1,159,823.60.  On appeal, Nihon Kohden and Plant wage a frontal assault against the judgment, itemizing nine separate claims of legal error.  After careful consideration, we reject each of Nihon Kohden's and Plant's contentions and affirm.

## I.

## Background

Astro-Med is a Rhode Island corporation with its principal place of business in West Warwick, Rhode Island.  Its Grass Technologies product group manufactures, sells, and distributes instruments for sleep and neurological research and clinical applications of sleep science and brain wave recording and analysis.  Although the identity of some of its customers is well known, Astro-Med's financial arrangements with its sales people, its marketing strategy, and its pricing and cost structures are all highly confidential, and Astro-Med makes strenuous efforts to protect its trade secrets and other confidential information.

In October 2002, even though Plant had no prior experience in the medical industry or in medical equipment sales, Astro-Med hired him as a Product Specialist, responsible for the demonstration and training of its Grass Technologies product line.  Astro-Med provided Plant with extensive training about its business, products, customers, and competitors, and it was Astro-Med's training that later made him marketable to Nihon Kohden.

- 4 -

When Astro-Med hired Plant, he signed an Employee Agreement, which contains a non-competition clause:

> I recognize that the Company sells its products throughout North America and Europe; as such, upon termination of my employment at the Company, for whatever reason, I shall not directly or indirectly enter into or engage in a business that competes with the Company, in a territory consisting of North America, and Europe, either as an individual, partner, joint venturer, employee, agent or salesman for any person, or as an officer, director or stockholder of a corporation or otherwise, for a period of one year thereafter.

And a trade secrets clause:

> [I hereby agree] [t]hat any inventions, discoveries or improvements and any technical data, trade secrets, (including, but not limited to, customer lists), information or know-how, made, discovered or conceived or acquired by me during the period of my employment, whether patentable, patented or not, are to be and remain the property of the Company; that, without the written authorization of the Company, I will neither use nor disclose to any person other than my superiors in the Company, any information, trade secrets, technical data or know-how relating to the Company's products, processes, methods, equipment and business practices, which I have acquired during my employment.

The Employee Agreement also contained a choice-of-law and forum-selection clause, which stated that it shall be governed by the laws of the state of Rhode Island and that Plant consented to jurisdiction in Rhode Island for any dispute arising out of the Agreement.

Subsequently, Plant asked to be transferred to the state of Florida and become a field sales representative; Astro-Med granted his request and paid to relocate him to Florida. On July 12, 2004, Astro-Med promoted Plant to District Sales Manager for sales of Grass Technologies products. As District Sales Manager, Plant had access to and used Astro-Med's trade secrets, including confidential marketing, pricing, and customer information. He became intimately familiar with Astro-Med's customers and their preferences as well as Astro-Med's pricing strategy and cost data. He also learned about Astro-Med's suppliers, products they supplied, and the customers who purchased these products. Finally, he was informed about Astro-Med's research and development efforts with respect to its Grass Technologies product line.

Nihon Kohden, a California corporation, has its principal place of business in Foothill Ranch, California. As a manufacturer of instrumentation for patient monitoring, sleep assessment, and neurology, Nihon Kohden competes directly with Astro-Med. In 2006, Brian Kehoe, the Florida sales representative for Nihon Kohden, was about to leave the company, and on July 21, 2006, he emailed Gary Reasoner, the Director of the Neurology Business Unit for Nihon Kohden, and informed him that he had met a man, Kevin Plant, who was a potential replacement for the Florida sales territory. Plant was indeed interested in employment with Nihon Kohden and in subsequent discussions, he emphasized his Astro-Med experience. He

reminded Nihon Kohden that he was "coming from the industry and one of the competitors in the field" and in his employment application, he touted his "in-depth knowledge of neurology-based applications."

In September 2006, Plant sent a resume to Reasoner, and Reasoner interviewed Plant several times over the telephone. In late September 2006, Plant traveled to Foothill Ranch and met with Michael Ohsawa, the Director of Operations for Nihon Kohden, and with Reasoner. Directly after the interview, Nihon Kohden made Plant a job offer, which he accepted. After Plant accepted the Nihon Kohden position, Kehoe emailed Plant: "I will be interested in seeing what you have in the works with Grass [Technologies]." Plant replied, "Sounds good."

Before offering Plant employment, Nihon Kohden became aware of the Astro-Med Employment Agreement with Plant and referred the contract to counsel for review. Nihon Kohden's lawyer advised Nihon Kohden that there was some minimal risk in hiring Plant; notwithstanding that advice, Nihon Kohden hired Plant to sell its products in competition with Astro-Med in the sales territory he had covered for Astro-Med.

## II.

## Discussion

### A.  The Jurisdictional Issue

From the very outset of this litigation, Nihon Kohden has vigorously maintained that, as a California business, it should not

have been haled into court in Rhode Island to defend its hiring of a Florida resident to sell its product in Florida.[2]  In support of its contention that it lacks sufficient contacts with Rhode Island to be subjected to jurisdiction, Nihon Kohden marshals evidence that it contends demonstrates an absence of any contacts between it and Rhode Island, between Plant and Rhode Island, and between its deal with Plant and Rhode Island.

### 1.   **Legal Standards**

To hear a case, a court must have personal jurisdiction over the parties, "that is, the power to require the parties to obey its decrees." United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 35 (1st Cir. 1999).  Early on, Nihon Kohden moved to dismiss the lawsuit under Federal Rule of Civil Procedure 12(b)(2) on the ground that the district court did not have personal jurisdiction. The district court denied the motion.  On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Mass. Sch. of Law at Andover, Inc. v. Amer. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).  Faced with a motion to dismiss for lack of personal jurisdiction, a district court "'may choose from among several methods for determining whether the plaintiff has met [its]

---

[2] Neither Nihon Kohden nor Plant contests the district court's exercise of jurisdiction over Plant.

- 8 -

burden.'" Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50-51 (1st Cir. 2002)).

Here, the district court used the "prima facie method" or the "prima facie evidentiary standard," rather than adjudicating the jurisdictional facts. Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145-47 (1st Cir. 1995) (describing the prima facie, preponderance, and likelihood standards). The district court considered "only whether the plaintiff has proferred evidence that, if credited, [was] enough to support findings of all facts essential to personal jurisdiction." Daynard, 290 F.3d at 51. Where, as here, the district court employed the prima facie standard, we review "both the district court's decision to use the prima facie standard and its conclusion under that standard de novo." Adelson, 510 F.3d at 48; Daynard, 290 F.3d at 51; Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712 (1st Cir. 1996). In this case, the parties "do not object to the court's choice of method; the defendant contends only that it was misapplied." Adelson, 510 F.3d at 48.

Applying the prima facie standard, we "'must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing.'" Id. (quoting Foster-Miller, 46 F.3d at 145). We "accept those facts as true, irrespective of whether the

- 9 -

defendant disputes them, and in so doing, construe them in the light most congenial to the plaintiff's jurisdictional claim." Id. (internal quotation omitted). The facts put forward by the defendant "become part of the mix only to the extent that they are uncontradicted." Id.

In assessing personal jurisdiction over a non-resident defendant, a federal court exercising diversity jurisdiction is "the functional equivalent of a state court sitting in the forum state." N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 24 (1st Cir. 2005) (internal quotation omitted). To establish personal jurisdiction over Nihon Kohden, Astro-Med must demonstrate that Rhode Island's long-arm statute grants jurisdiction and that the exercise of jurisdiction under the statute is consistent with the Due Process Clause of the United States Constitution. Daynard, 290 F.3d at 52. The Rhode Island long-arm statute is coextensive with the permissible reach of the Due Process Clause.[3] N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 16 (1st Cir. 2009); Nicholas v. Buchanan, 806 F.2d 305, 306-07 (1st Cir. 1986); Cerebus Partners, L.P. v. Gadsby & Hannah, LLP, 836 A.2d 1113, 1118 (R.I. 2003); Almeida v. Radovsky, 506 A.2d 1373, 1374 (R.I. 1986). Thus, the due process inquiry controls. Due process "requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the

---

[3] R.I. Gen. Laws § 9-5-33(a).

forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)); N. Laminate Sales, 403 F.3d at 25.

There are two means of establishing jurisdiction over a defendant's person available under the Fourteenth Amendment: specific and general jurisdiction. For specific jurisdiction, the plaintiff's claim "must be related to the defendant's contacts." Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005). For general jurisdiction, "in which the cause of action may be unrelated to the defendant's contacts, the defendant must have continuous and systematic contacts with the state." Id. Here, the district court concluded that it had both specific and general jurisdiction. Since we conclude that the district court correctly concluded it had specific jurisdiction, we will address only that issue.

## 2. **Specific Jurisdiction**

This circuit "divides [the] minimum contacts analysis into three inquires: relatedness, purposeful availment, and reasonableness." N. Laminate Sales, 403 F.3d at 25; Cardinale, 567 F.3d at 16 (stating that "personal jurisdiction under International Shoe, allowing jurisdiction to be asserted as to a specific claim, can be established where the defendants availed themselves of the

opportunity to do business in the state, the claim in question is related to that access and the so-called gestalt factors are consistent with requiring an out of-state defendant to defend within the state"); Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008); Children's Hosp., 432 F.3d at 57. "Questions of specific jurisdiction are always tied to the particular claims asserted." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999). Astro-Med's claims against Nihon Kohden sound in tort,[4] and in tort cases, a court "charged with determining the existence vel non of personal jurisdiction must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." Id.

### (a) Relatedness

The first inquiry, relatedness, asks whether "'the claim underlying the litigation . . . directly arise[s] out of, or relate[s] to, the defendant's forum-state activities.'" N. Laminate Sales, 403 F.3d at 25 (quoting United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)). The relatedness test is a "'flexible, relaxed standard.'" Id. (quoting Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994)).

---

[4] The claims against Nihon Kohden sound only in tort, but the claims against Plant include a breach of contract claim, which was submitted to the jury by special interrogatory and resulted in a verdict against Plant.

Focusing on the tortious interference with a contractual relationship claim, to prove such a claim, a plaintiff in Rhode Island must establish the following elements: "'(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom.'" Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995) (quoting Smith Dev. Corp. v. Bilow Enters., Inc., 308 A.2d 477, 482 (R.I. 1973)). Before Nihon Kohden hired Plant, it knew that Astro-Med was located in Rhode Island, that Plant had entered into the Employee Agreement in Rhode Island, that the contract specified it would be governed by Rhode Island law, that the contract contained non-competition and non-disclosure provisions, and that by virtue of the contract, Plant had consented to the exclusive jurisdiction of the courts of Rhode Island over any disputes related to the contract. Further, Nihon Kohden had sought and obtained legal advice that by hiring Plant, it was exposing itself to some legal risk. Thus, Nihon Kohden knew that by employing Plant, it was running the risk that Plant would thereby have breached his Rhode Island contract with a Rhode Island company and any ensuing suit would be initiated in Rhode Island and interpreted under Rhode Island law.

Despite this formidable array of Rhode Island connections, Nihon Kohden insists that because it is a California corporation and because all its direct dealings with Plant, a

- 13 -

Florida resident, took place either in Florida or in California, jurisdiction cannot lie in Rhode Island. Nihon Kohden's argument, however, emphasizes too fine a point. Consistent with Calder v. Jones, 465 U.S. 783, 789 (1984), a defendant "need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." N. Laminate Sales, 403 F.3d at 25. Nihon Kohden's conduct in Florida and California was a cause of the breach of contract – the actual injury – that occurred in Rhode Island. That in-forum injury was clearly related to Astro-Med's tortious interference claim, satisfying the first prong of the minimum contacts analysis.

**(b) Purposeful Availment**

To satisfy the second requirement, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." N. Laminate Sales, 403 F.3d at 25 (quoting United Elec. Workers, 960 F.3d at 1089). The focus is on "voluntariness and foreseeability." Id. (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)). Here, Nihon Kohden was fully aware of the Astro-Med – Plant Employee Agreement, including its Rhode Island provisions, and persisted in negotiations in the face of legal advice from its own counsel that

to do so would pose a risk.  It must have been foreseeable to Nihon Kohden that it "might be held accountable for [its actions] in a [Rhode Island] forum."  Id. at 26.

### (c)  Reasonableness

To evaluate the reasonableness requirement, the Supreme Court has provided a set of "gestalt factors" to consider.  N. Laminate Sales, 403 F.3d at 26; United Elec. Workers, 960 F.2d at 1089.  These factors include:  the defendant's burden of appearing, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and the shared interest of the several States in furthering fundamental substantive social policies.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985); N. Laminate Sales, 403 F.3d at 26.  Nihon Kohden contends that Rhode Island's assertion of jurisdiction imposed a substantial burden on Nihon Kohden, because inter alia it has no offices or employees in the state of Rhode Island and all percipient witnesses to the hiring of Plant and other information about the misappropriation of trade secrets were located either in California or Florida.

Nihon Kohden's position becomes manifestly untenable when Astro-Med's companion litigation against Plant is factored into the mix.  As Nihon Kohden concedes, Astro-Med had the legal right to

initiate a lawsuit for breach of the Employment Agreement against Plant in Rhode Island, the state where the contract was formulated and executed. Once Rhode Island asserted uncontested jurisdiction over the breach of contract claim and the related misappropriation of trade secrets and unfair competition claims, the Florida and California witnesses and evidence were heading for trial in Rhode Island. Nihon Kohden's earnest complaint about undue burden rings hollow, when its alternative would have resulted in two separate cases in two jurisdictions on opposite ends of the country – either Rhode Island and Florida or Rhode Island and California. Contrary to Nihon Kohden's position, the gestalt factors militate strongly in favor of jurisdiction in Rhode Island.

### (d) Specific Jurisdiction – Conclusion

Applying the specific jurisdiction tripartite analysis, we conclude that the district court properly asserted jurisdiction over Astro-Med's claims against Nihon Kohden. We need go no further.

### B. Venue

Nihon Kohden argues that Rhode Island was not the proper venue for Astro-Med's lawsuit, and the district court should have either dismissed the claim or transferred the case to a different district in accordance with 28 U.S.C. § 1404.[5]

---

[5] Plant has not challenged the court's venue decision.

- 16 -

1. **Determining Venue**

The applicable venue provision of Title 28 states:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Although Nihon Kohden is a California business, it resides for purposes of venue in Rhode Island.[6] Plant is a resident of Florida. As the defendants reside in different states, subsection (1) does not apply.

Under subsection (2), the question becomes whether the District of Rhode Island is "a judicial district in which a substantial part of the events . . . giving rise to the claim occurred." Id. In determining whether Rhode Island is a district in which a substantial part of the events occurred, we look "not to

---

[6] With regard to corporations, 28 U.S.C. § 1391(c) provides that, "[for] purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." Because we have concluded that Nihon Kohden is subject to personal jurisdiction in Rhode Island, we can also conclude that Nihon Kohden, a corporation, "resides" in Rhode Island pursuant to 28 U.S.C. § 1391(c).

- 17 -

a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." Uffner v. La Reunion Francaise, S.A., 244 F.3d 38, 42 (1st Cir. 2001) (quoting Mich. Corp. v. Bramlet, 141 F.3d 260, 263-264 (6th Cir. 1998)). In addition, we do not focus on the actions of one party. Rather, our approach takes a "holistic view of the acts underlying a claim." Id. at 43 n.6. Furthermore, we are not required to determine the best venue, merely a proper venue. See id. at 42 (quoting Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2nd Cir. 1992), for the proposition that venue may be proper in any number of districts). Thus, even though Plant was a resident of Florida when he was hired by Nihon Kohden, a California corporation, venue in Rhode Island may still be proper. Id. at 43 (stating that "§ 1391 contemplates that venue may be proper in several districts").

Astro-Med and Plant entered into an employment contract in Rhode Island, the district in which Astro-Med was headquartered, that contained the non-compete and non-disclosure clauses at issue here. With full knowledge of the Employee Agreement and its contents, Nihon Kohden hired away Plant, thereby interfering with Astro-Med's contract and misappropriating its trade secrets. Because Astro-Med was headquartered in Rhode Island, this district is one of the places where the tortious interference and misappropriation of trade secrets occurred and where the harms from these torts were felt. See Bates, 980 F.2d at 868 (2nd Cir. 1992).

In addition, Rhode Island was the forum selected by the Employee Agreement to resolve disputes. See Lambert v. Kysar, 983 F.2d 1110, 1118 n.11 (1st Cir. 1993) (upholding forum selection clause). Taken together, these facts constitute a substantial part of Astro-Med's claims against Nihon Kohden.

Further, Plant did not contest venue in Rhode Island and that portion of the lawsuit was, for venue purposes, going to proceed in Rhode Island. Thus, the convenience of the parties strongly militated in favor of retention of venue in Rhode Island. Uffner, 244 F.3d at 43 ("[T]he general purpose of the venue rules is 'to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial.'") (quoting LeRoy v. Great W. United Corp., 443 U.S. 173, 183-84 (1979)). Given that a substantial part of Astro-Med's claims involved Rhode Island and proceeding in Rhode Island would not thwart the underlying purpose of the venue statute, we conclude that the district court did not err in refusing to dismiss the claims pending against Nihon Kohden in Rhode Island for improper venue.

### 2. **Transfer of Venue**

Nihon Kohden also appeals the district court's denial of its motion for change of venue under 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart

Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).  Where the contract between the parties, here speaking of Astro-Med and Plant, contains a forum-selection clause, the clause "will be a significant factor that figures centrally in the District Court's calculus."  Royal Bed & Spring Co. v. Famossul Industria e Comercio de Moveis Ltda., 906 F.2d 45, 51 (1st Cir. 1990) (quoting Stewart, 487 U.S. at 29).  We review a "district court's decision on transfer of venue for an abuse of discretion."  Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000); Cianbro Corp. v. Curran-Lavoie, Inc., 814 F.2d 7, 11 (1st Cir. 1987).  Not only does the burden of proof rest with the party seeking to transfer; there is a "strong presumption in favor of the plaintiff's choice of forum."  Coady, 223 F.3d at 11. In the circumstances of this case, the district court did not abuse its discretion in denying Nihon Kohden's motion for transfer of venue.

### C. **The Verdict**

Following the verdict, Nihon Kohden and Plant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moved for new trial under Federal Rule of Civil Procedure 59 or in the alternative for remittitur.  The district court denied each post-trial motion.  Defendants object both to a number of the district court's legal rulings and to the verdict, claiming that

"the evidence strongly supported (almost mandated) a defense verdict."  We disagree.

## 1.   **Legal Standards**

"We review the district court's denial of a motion for judgment as a matter of law, including legal decisions made therein, de novo."   Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009).  However, a jury's verdict "must be upheld 'unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict].'"  Borges Colon v. Roman-Abreu, 438 F.3d 1, 14 (1st Cir. 2006) (alteration in original) (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993)).  We must affirm "'unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment.'"  N. Laminate Sales, 403 F.3d at 26 (quoting Sheils Title Co. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1st Cir. 1999)).

An appellant's "hurdle is no lower on an appeal of a denial of a Rule 59 motion for a new trial."  Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).  The evidence is again viewed in the light most favorable to the verdict.  Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 245 (1st Cir.

2005).  A new trial is warranted "only if the verdict, though rationally based on the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." Bogosian v. Mercedes-Benz of N. Am., 104 F.3d 472, 482 (1st Cir. 1996) (internal quotation omitted).  We reverse only if "the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice." Levesque v. Anchor Motor Freight, Inc., 832 F.2d 702, 703 (1st Cir. 1987). Similarly, a district court's denial of a motion for remittitur will be reversed only if "the jury's verdict exceeds 'any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'" Smith v. Kmart Corp., 177 F.3d 19 (1st Cir. 1999) (quoting Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988)).  The jury's damage award must endure unless it is "'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" Correa v. Hosp. San Francisco, 69 F.3d 1184, 1197 (1st Cir. 1995) (quoting Segal v. Gilbert Color Sys., Inc., 746 F.2d 78, 81 (1st Cir. 1984)).  We review a denial of a motion for new trial or remittitur for an abuse of discretion. Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 46 (1st Cir. 2009).

## 2. The Non-Competition Provision

Astro-Med's Employee Agreement with Plant contained a one-year non-competition provision:

- 22 -

> I recognize that [Astro-Med] sells its products throughout North America and Europe; as such, upon termination of my employment at the Company, for whatever reason, I shall not directly or indirectly enter into or engage in a business that competes with the Company, in a territory consisting of North America, and Europe, either as an individual, partner, joint venturer, employee, agent or salesman for any person, or as an officer, director or stockholder of a corporation or otherwise, for a period of one year thereafter.

Defendants argue that the non-competition provision was unenforceable until it was modified by the district court, that changes in Plant's employment status voided the agreement, that Astro-Med's own breach of the employment agreement voided Plant's obligations under the agreement, that the non-competition provision was unenforceable since it did not protect legitimate business interests, and that Nihon Kohden cannot be liable for interfering with an unenforceable contract. We address each contention.

**(a) <u>Partial Enforcement</u>**

In the district court, defendants objected to the territorial breadth of this provision, which included not only all of North America but also all of Europe, and to the breadth of the activity captured by the provision. Defendants cited Rhode Island state law, which disfavors non-competition covenants. <u>See</u>, <u>e.g.</u>, <u>Cranston Print Works Co.</u> v. <u>Pothier</u>, 848 A.2d 213, 220 (R.I. 2004); <u>Koppers Prods. Co.</u> v. <u>Readio</u>, 197 A. 441, 444-45 (R.I. 1938) (stating that "noncompetitive employment contracts are carefully scrutinized by the court and only enforced when reasonable and when

- 23 -

the restriction does not extend beyond what is apparently necessary for the protection of those in whose favor they are made"). Consistent with Rhode Island law, the district court partially enforced the non-competition provision, restricting its territorial application to the state of Florida and to a limited subset of Astro-Med customers. See Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1058-59 (R.I. 1989).

Defendants do not complain about the trial court's more restrictive interpretation of the Employee Agreement. Instead, they argue that the non-competition provision was not enforceable until the district court modified it to make it enforceable. We have no quarrel with defendants' general contention that under the partial enforcement rule, an overly-broad non-competition provision cannot be enforced until it is modified, a proposition that seems self-evident. But, defendants' real contention is that a party to a non-competition agreement cannot breach the agreement until it is judicially modified, and specifically that it was impossible for Plant to breach his agreement with Astro-Med until the district court modified the provision to make it enforceable.[7]

---

[7] Defendants cite two cases in support of the proposition that a non-competition clause cannot be breached until it is modified: Durapin and Hawkins v. daly.commerce, inc., No. 2000-5740, 2003 R.I. Super. LEXIS 14 (R.I. Super. Ct. Feb. 10, 2003). Neither Durapin nor Hawkins says such a thing. In Durapin, the Supreme Court of Rhode Island affirmed a trial court decision to invalidate a non-competition provision in its entirety. Durapin, 559 A.2d at 1056-59. Durapin does not say that a party to a non-competition agreement cannot violate it until it is modified; it says that,

Defendants' contention does not withstand analysis. Their logic would give the promisor in a non-competition agreement one free breach, requiring a prior judicial order before the provision could be said to have been violated. Such a proposition, the validity of which is without authority, would eviscerate all but the most narrowly tailored non-competition agreements, since a modification of any term of the provision would justify a breach of all its terms. Further, because most breaching employees gain the full benefit of the breach the first time they compete with their former employer, a second breach after judicial warning would in most cases be cumulative. Also, once a court restricts the scope of the non-competition agreement, the breaching party is being held to a more narrowly circumscribed agreement than the one he signed, and the more restrictive terms of the agreement remain as effective as the day they were agreed to. Finally, contrary to defendants'

---

under the circumstances, there was no need to modify an unenforceable restrictive covenant. Id. at 1059. In Hawkins, daly.commerce, inc., Richard Hawkins's former employer, argued that he violated the provisions of a non-competition agreement by accepting employment with a business "of the type and character" similar to daly's. Hawkins, 2003 R.I. Super. LEXIS 14, at *4-5. The Superior Court concluded that the new employment was not of the type and character engaged in by daly, and refused to enforce the non-competition provision. Hawkins, at *13-14. The Hawkins court quoted the familiar teaching that restrictive covenants "will only be enforced when reasonable and where restrictions do not extend beyond what is apparently necessary for the protection of the employer's business," id., but this statement, which defendants quote, does not begin to suggest that a non-competition provision cannot be violated until after there has been a judicial determination of its proper scope.

- 25 -

contention, the courts in Rhode Island have consistently issued orders against prior breaches of modified provisions. R.J. Carbone Co. v. Regan, 582 F. Supp. 2d 220 (D.R.I. 2008) (modifying a non-competition agreement and issuing a preliminary injunction against the former employee); Nestle Food Co. v. Miller, 836 F. Supp. 69 (D.R.I. 1993) (granting injunctive relief on the basis of a modified non-competition agreement and awarding nominal damages for conduct occurring prior to modification); Cranston Print Works, 848 A.2d at 221 (reversing a preliminary injunction, directing the trial court to determine the reasonableness of a non-competition covenant and to decide "what remedies, if any, are appropriate for any proven violations of the settlement agreement"); Aim High Acad., Inc. v. Jessen, No. KC-2008-1384, 2008 R.I. Super. LEXIS 152 (R.I. Super. Ct. Dec. 10, 2008) (modifying geographic range and issuing a preliminary injunction against former employees); Carcieri v. Creative Servs., Inc., No. 92-0726, 1992 R.I. Super. LEXIS 25 (R.I. Super. Ct. July 6, 1992) (modifying geographic scope and issuing preliminary injunction against former employees).

### (b) Changes in Plant's Employment

Defendants next contend that after Astro-Med hired Plant, it made material changes in his employment, which voided the non-competition provision. They note that Plant's job changed in 2004 from product specialist in Rhode Island to salesperson in Florida, and in 2006, Astro-Med substantially reduced his sales territory.

Regarding the job change, defendants point out that the introductory paragraph of the employment agreement states that it applies only to employees involved in the "design, development or manufacture of products for the Company." Defendants argue that once Plant became a salesman, this definitional language did not apply to him.

Turning first to material change, defendants cite <u>AFC Cable Sys. Inc.</u> v. <u>Clisham</u>, 62 F. Supp. 2d 167 (D. Mass. 1999) (applying Massachusetts law), for the proposition that a change in an employee's job can void a non-competition agreement. It is apparently correct that under Massachusetts law, "[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." <u>Lycos, Inc.</u> v. <u>Jackson</u>, No. 2004-3009, 2004 Mass. Super. LEXIS 348 (Mass. Super. Ct. Aug. 24, 2004). The genesis of the Massachusetts material change rule is <u>F.A. Bartlett Tree Expert Co.</u> v. <u>Barrington</u>, 233 N.E.2d 756 (Mass. 1968). However, as interpreted in Massachusetts, "in both <u>Bartlett Tree</u> and <u>AFC Cable Systems</u>, the court found that the conduct of the parties clearly showed that they had abandoned and rescinded by mutual consent the earlier employment agreement containing the pertinent non-compete provision and had entered into a new employment relationship that included no such non-compete provision." <u>Intertek Testing Servs. N.A., Inc.</u> v.

Curtis-Strauss LLC, No. 98-903-F, 2000 Mass. Super. LEXIS 354, at *20 (Mass. Super. Ct. Aug. 8, 2000). Further, "in both cases, the employer provided the employee with a new employment agreement, which the employee refused to sign." Id. at *21; see Iron Mountain Info. Mgmt., Inc. v. Taddeo, 455 F. Supp. 2d 124, 133 (E.D.N.Y. 2006) (applying Massachusetts law and stating that "[i]n determining whether there has been a material change to the employment relationship, courts have considered it extremely significant that the employer sought to have the employee sign a new non-compete agreement"). The question, according to Intertek, is whether the employment agreement had been "mutually abandoned and rescinded." Intertek, 2000 Mass. Super. LEXIS 354, at *21; Slade Gorton & Co. v. O'Neil, 242 N.E.2d 551, 554 (Mass. 1968) (describing the question as whether the contract was "abandoned or superseded by the conduct of the parties prior to [the employee's] resignation"); Bartlett Tree, 233 N.E.2d at 587 (observing that changes in the employee's remuneration and sales area, memorialized in a new contract that the employee refused to sign, "strongly suggest that the parties had abandoned their old arrangement and had entered into a new relationship"). Finally, "whether there has been such a modification of a previous agreement, rather than an implied revocation or termination of the agreement as the result of such a subsequent change, depends upon the intention of the parties." Mail-Well Envelope Co. v. Saley, 497 P.2d 364, 369 (Or.

1972); see Bartlett Tree, 233 N.E.2d at 587 (noting that parties' conduct subsequent to changes in employee's position was inconsistent with an intention that the original remained in effect).

Assuming that Rhode Island would adopt Massachusetts' material change rule, the evidence in this case is insufficient to generate its application. See Elizabeth Grady Face First, Inc. v. Escavich, 321 F. Supp. 2d 420, 424 (D. Conn. 2004) (stating that Bartlett Tree and AFC Cable "stand for nothing more than the unremarkable proposition that contracting parties are free to abandon their prior contracts and form new ones, and an intention to do so may be evidenced not only by words or writing but also by the parties' conduct"). Plant's job change from product specialist to district sales manager does not reflect a mutual abandonment and rescission of the non-competition provision; there is no suggestion that Astro-Med approached Plant with a new employment agreement; and, there is no evidence of intent on either Astro-Med's or Plant's part to revoke or supersede the employment agreement.

Regarding the supposed restriction in the Employee Agreement to work "involving design, development or manufacture of products for the Company," defendants' reading of the agreement is much too narrow. The introductory paragraph of the Employee Agreement provides, in part: "I am now or am about to be employed by Astro-Med, Inc. . . . and in connection with such employment, I

- 29 -

am, may, or will be engaged in work relating to the Company's business, involving design, development or manufacture of products for the Company." On the basis of this recital and in exchange for continued employment and compensation, a signatory of the Agreement, here Plant, makes various promises, including not to compete. The recital cannot fairly be read to apply only to those employees involved in design, development, or manufacture of products for Astro-Med. The subordinate clause, "design, development or manufacture of products", describes the nature of Astro-Med's business; it does not limit the type of work an employee must perform at Astro-Med to become subject to the Agreement.

### (c) Astro-Med's Breach

Defendants claim that by substantially reducing Plant's sales territory, Astro-Med materially breached the Employee Agreement, thereby releasing Plant from its non-competition provisions. However, as the district judge observed, during trial, Plant admitted that when he accepted the sales position in Florida, Astro-Med informed him that his sales territory might be partly reallocated in the future. When Astro-Med later reduced his sales territory, it was acting in accordance with the agreement of the parties, and viewing the evidence in the light most favorable to the verdict, Astro-Med cannot be said to have breached the contract by implementing its agreed-upon terms.

**(d) Legitimate Business Interests**

Defendants' final argument against the enforceability of the non-competition provision is that it was not designed to protect Astro-Med's legitimate business interests. Rhode Island law requires that a party seeking to enforce a non-competition agreement demonstrate that "there exists a legitimate interest that the provision is designed to protect." Durapin, 559 A.2d at 1053; Max Garelick, Inc. v. Leonardo, 250 A.2d 354, 357 (R.I. 1969). While "the desire to be free from competition, by itself, is not a protectable interest," Durapin, 559 A.2d at 1057, protecting a business's confidential information and goodwill—such as the special relationship its sales force has developed with customers—may qualify as a legitimate interest. R.J. Carbone, 582 F. Supp. 2d at 225; Nestle, 836 F. Supp. at 74-75; Dial Media, Inc. v. Schiff, 612 F. Supp. 1483, 1489 (D.R.I. 1985); Rego Displays, Inc. v. Fournier, 379 A.2d 1098, 1102 (R.I. 1977). At trial, Astro-Med produced evidence of the proprietary nature of the information it disclosed to Plant, including strengths and weaknesses of its products, its pricing strategies, the new products under development, and its customers. The evidence is sufficient to sustain the verdict.

**(e) Interference with an Enforceable Agreement**

Because defendants have failed to demonstrate that the non-competition provision in the Employee Agreement is

unenforceable against Plant, the argument that Nihon Kohden could not have interfered with the Employee Agreement also fails.

### 3.    **Evidence of Trade Secret Misappropriation**

Based largely on the testimony of Astro-Med employees, defendants insist that there is no evidence that either Plant or Nihon Kohden ever used any of Astro-Med's confidential information. They contend that this failure dooms Astro-Med's misappropriation claim, which they say requires proof that Astro-Med "shared a confidential relationship with the defendant, possessed a trade secret, disclosed it to the defendant, and that the defendant made use of the disclosure in breach of the confidence reposed in him." Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985).

Defendants' reliance on our discussion of Massachusetts tort law in Burten is misplaced.  Astro-Med's misappropriation claim arises under the Rhode Island Uniform Trade Secrets Act, R.I. Gen. Laws § 6-41-1 et seq., which defines "misappropriation" as follows:

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>> (A) Used improper means to acquire knowledge of the trade secret; or
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

> (I) Derived from or through a person who had utilized improper means to acquire it;
>
> (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

R.I. Gen. Laws § 6-41-1(2). The Act's definition of "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy." Id. § 6-41-1(1). Misappropriation thus includes disclosure of a trade secret by one who acquired it while under a duty to maintain its secrecy and the acquisition of a trade secret by one who knows that it was acquired by breach of a duty to maintain secrecy. Contrary to defendants' assertion, Astro-Med need not have shown that either Plant or Nihon Kohden "used" Astro-Med's trade secrets; disclosure or acquisition is sufficient to constitute misappropriation, subjecting defendants to liability for actual loss and unjust enrichment caused by the misappropriation. Id. § 6-41-3(a).

Here, there was ample evidence that the very reason Nihon Kohden hired Plant was to obtain access to his intimate knowledge

- 33 -

of Astro-Med's business.[8]  Viewing the evidence in the light most favorable to the verdict, it is a logical inference that a competitor who hires away a rival's valued employee with access to inside information has done so in order to use that inside information to compete with the rival, and it is an equally logical inference that once Plant became a Nihon Kohden employee, he sought to justify its hiring decision by revealing and using the information Nihon Kohden had bargained for.

## 4. **Damages**

Defendants next say that Astro-Med failed to produce evidence of direct sales that Astro-Med lost to Nihon Kohden as a consequence of its hiring Plant, and that to prove damages, Astro-Med instead relied on sales quotations, not actual sales. Defendants contend that to rely on sales quotations, not actual sales, required the jury to assume a damages verdict based on speculation and conjecture in violation of law. Nestle, 836 F.

---

[8] For example, email exchanges between Plant and Nihon Kohden reveal that after Plant accepted the Nihon Kohden job offer, Brian Kehoe, a Nihon Kohden employee, wrote to Plant that he will be "interested to see what you have in the works with Grass" and he will be "happy to start communication from [Nihon Kohden] if it will help you on some Grass accounts." (Grass is the product group for which Plant worked.) Plant replied, "Sounds good." Plant also explained that Kehoe handled sales with Astro-Med customers that Plant was precluded from contacting by a preliminary injunction ordered by the district court. Given the understanding between Plant and Kehoe, the jury could reasonably have inferred that Plant disclosed to Kehoe, and Nihon Kohden (knowing the terms of Plant's Employee Agreement) acquired through Kehoe, trade secrets that Plant had learned while subject to a duty of non-disclosure.

Supp. at 78 (reiterating the "enduring rule that damages must be established by a reasonable certainty and may not be recovered if purely speculative"). At the same time, Astro-Med is not required to prove its damages "with mathematical precision." Cordeco Dev. Corp. v. Santiago Vasquez, 539 F.2d 256, 262 (1st Cir. 1976). "All that is required is a reasonable basis of computation and the best evidence obtainable." Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A., 728 F.2d 572, 575-76 (1st Cir. 1984).

The district court undertook a painstaking analysis of the damages evidence at the trial and considered as well the reasons why Nihon Kohden did not present evidence of actual sales. We have reviewed the district court's careful review of the evidence and can add nothing. It suffices to say, as the district court concluded, that the evidence, again when viewed in the light most favorable to the verdict, supports the damage award.

### 5. **An Inconsistent and Nonsensical Verdict**

Defendants correctly observe that the jury issued the following monetary awards: (1) $41,900 against Plant for breach of contract; (2) $41,900 against Nihon Kohden for intentional interference with the Astro-Med – Plant contract; (3) $280,000 against Plant and Nihon Kohden for misappropriation of trade secrets; and, (4) $12,000 against Plant for unfair competition. Nihon Kohden characterizes these awards as "non-sensical based on

their inconsistency and lack of evidentiary support."  Other than strongly telegraphing its resolute disenchantment with the verdict, defendants have not explained why these monetary awards are inconsistent.  We are left to guess.  It is well settled in this circuit that "issues 'adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned.'"  Piedrahita v. Mukasey, 524 F.3d 142, 144 (1st Cir. 2008) (quoting Tum v. Gonzales, 503 F.3d 159, 160 (1st Cir. 2007)).  We will not attempt to supply an argument the appellant has not articulated.[9]

### 6.   **Evidentiary Rulings and Jury Instruction**

Nihon Kohden raises several claims of error in the district court's evidentiary rulings.  We have carefully reviewed Nihon Kohden's contentions and conclude that Nihon Kohden failed to preserve some of its claims, and failed to adequately develop others; as to the remainder, we conclude the district court did not err.

Defendants also contend that the district court erred when it instructed the jury on Plant's failure to produce evidence of the commissions he received as a Nihon Kohden employee. The district court gave the following instruction:

---

[9] This cannot come as a surprise to defendants.  Addressing the same contention with a similar lack of specificity, the district court came to the same conclusion.

> If you find that Kevin Plant failed to produce documents or information concerning the actual sales that he made on behalf of Nihon Kohden in the state of Florida, you may infer from Kevin Plant's nonproduction that the documents and information are unfavorable to the defense.

Defendants did not object to the instruction and they therefore forfeited their right to object on appeal. See Fed. R. Civ. P. 51(c)(2)(B) (stating that a party must "object[] promptly after learning that the instruction or request will be, or has been, given or refused"); Baron, 402 F.3d at 235. "Our interpretation of Rule 51 is quite strict." Connelly v. Hyundai Motor Co., 351 F.3d 535, 544 (1st Cir. 2003). "There is a good reason for this strictness. We enforce our object-or-forfeit rule to compel litigants to afford the trial court an opportunity to cure [a] defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." Flynn v. AK Peters, Ltd., 377 F.3d 13, 25 (1st Cir. 2004) (alteration in original) (internal quotation omitted). We review defendants' forfeited claim only for plain error. Baron, 402 F.3d at 236.

Defendants acknowledge that an adverse inference instruction may be allowed when a party fails to produce a document that exists or should exist and is within its control. See Grajales-Romero v. American Airlines, 194 F.3d 288, 299 (1st Cir. 1999); see also United States v. St. Michael's Credit Union, 880

F.2d 579, 597 (1st Cir. 1989) (stating that "[t]he failure of a party to produce available evidence that would help decide an issue may justify an inference that the evidence would be unfavorable to the party to whom it is available"). But, they say that such an instruction should not have been given in this case, because there was no evidence that a document relating to Plant's sales as a Nihon Kohden employee existed. Contrary to defendants' claim, Plant testified that his paychecks from Nihon Kohden included a document graphing his Florida sales and commission from these sales. Plant also testified that he had not brought these documents with him to court, because he was not asked to do so. Plant's testimony demonstrates that Nihon Kohden produced a relevant document, and that Plant possessed this document, but had not brought it to court. This testimony properly generated the adverse inference instruction.

D. **Miscellaneous Issues**

Defendants mention other claims of legal error. They object to the way the charge conference was held, demand a remittitur to zero damages and an order vacating all orders regarding post-trial awards of punitive damages and attorneys' fees, and ask that the sanctions against counsel be reversed. But, they fail to address any of these issues in their brief, except in passing. Again, we will not address claims of error that

defendants failed to develop.  <u>Piedrahita</u>, 524 F.3d at 145; <u>Ryan</u>, 916 F.2d at 734.

## III.

## <u>Conclusion</u>

The district court judgment is affirmed.

**It is so ordered.**


**- Concurring Opinion Follows -**

**HOWARD**, **Circuit Judge**, **concurring**.  Although our conclusion that Rhode Island has personal jurisdiction over Nihon Kohden is in my view correct, our inquiry on the relatedness prong of specific jurisdiction may be seen by some as being in tension with much of our precedent.  That tension makes this a close case for me, and so I think it proper to add a few words of my own about our conclusion.

The general principles are uncontroversial.  To establish that specific jurisdiction exists over a particular defendant, a plaintiff must satisfy, among other things, a "relatedness" requirement.  Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008).  More precisely, the plaintiff must show that the claim directly relates to, or arises out of, the defendant's forum-based contacts.  Id.

Even nearer to the point, in determining what constitutes sufficient contact for purposes of the relatedness inquiry, traditionally we have focused on the defendant's in-forum conduct or activity.  See Hannon v. Beard, 524 F.3d 275, 282 (1st Cir. 2008).  And where a plaintiff alleges a tort, as Astro-Med has in this case, we have regularly required that there be a causal nexus between the defendant's in-forum conduct or activity and the claim advanced by the plaintiff.  Id.  ("In typical tort claims, our inquiry is 'whether the plaintiff has established cause in fact (i.e., the injury would not have occurred but for the defendant's

forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action).'") (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998)); Harlow v. Children's Hosp., 432 F.3d 284, 289 (1st Cir. 2005) ("[T]he defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case.") (quotations omitted); Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999) ("[I]n a tort case, a court charged with determining the existence vel non of personal jurisdiction must probe the causal nexus between the defendant's [in-forum] contacts and the plaintiff's cause of action.").

"Although the standard for relatedness for a tort claim is typically different from that of a contract claim," Phillips, 530 F.3d at 27, where "the tort is intentional interference with a contractual or business relationship, the two inquiries begin to resemble each other." Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 10 (1st Cir. 2002). But even in contract cases, the focus remains on in-forum conduct or activity. Phillips Exeter Acad., 196 F.3d at 289 (noting that where the cause of action is for an alleged breach of contract, we ask whether the defendant's activity in the forum state was "instrumental either in the formation of the contract or in its breach.").

The problem here is that, from all appearances, Nihon Kohden did not engage in any in-forum conduct or activity that is causally connected to the alleged tort. Nihon Kohden's actual conduct constituting the alleged interference with Astro-Med's and Plant's contractual relationship took place in Florida and in California, not in Rhode Island. And for aught that it appears, neither did Plant's contract-breaching conduct, resulting from Nihon Kohden's actions, take place in Rhode Island. These facts necessarily narrow the relatedness inquiry in this case to a focus that is solely on the location of the injury to Astro-Med. That approach, however, may be thought to endorse the application of the "effects test," a test that we have said has no place in assessing relatedness. United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 623 (1st Cir. 2001) ("[T]he 'effects' test is a gauge for purposeful availment and is to be applied only after the relatedness prong has already been satisfied."); see also Mass. Sch. of Law v. ABA, 142 F.3d 36, 36 (1st Cir. 1998) ("We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative.").

Despite our cases limiting the application of the effects test, we have also on other occasions found the relatedness requirement satisfied based on the in-forum effects of out-of-state conduct. See, e.g., N. Laminate Sales, Inc. v. Davis, 403 F.3d 14,

25 (1st Cir. 2005). In the context of the specific circumstances of this case, I believe there is justification for employing the slightly less rigid approach exemplified by Northern Laminate. Cf. Nowak v. Tak How Investments, Ltd. 94 f3d 708, 716 (1st Cir. 1996) ("[R]elatedness cannot merely be reduced to one tort concept for all circumstances."). That is because the economic tort at issue in this case was not completed until Astro-Med suffered injury in Rhode Island.[10] See Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995) (laying out the elements of tortious interference with a contractual relationship claim under Rhode Island law); see also Janmark, Inc. v. Reidy, 132 F.3d 1200, 1202 (7th Cir. 1997). Indeed, the victim of a business tort often will suffer an economic injury, without which there has been no tort, in a forum that the defendant has not contacted in the classic sense. Construing the relatedness requirement in such cases slightly more generously than we might in others often will permit the best-suited forum to entertain the dispute, provided, of course, that the purposeful availment and reasonableness requirements are satisfied.

It may also be reiterated that a showing was made in the district court that Nihon Kohden had several commercial contacts in

---

[10]Nothing in the record prevents a finding that the Rhode Island-based plaintiff in this case has suffered injury in Rhode Island, both in the fact of, and as a consequence of, the breach of its Rhode Island-formed and -managed employment relationship with Plant.

Rhode Island, albeit not directly related to this cause of action, leading the district court to find general jurisdiction. While I do not suggest that a blending of the general and specific jurisdiction inquiries would be appropriate, see, e.g., O'Connor v. Sandy Lane Hotel Co. Ltd., 496 F.3d 312, 319-22 (3rd Cir. 2007) (discussing, but declining to apply, hybrid test for relatedness), the result in this case can hardly be characterized as unfair. Nihon Kohden had commercial contacts in Rhode Island, it knew full-well that it was tangling with an employment relationship formed in Rhode Island, and the purposeful availment and reasonableness requirements are easily satisfied in this case.

**- Concurring Opinion Follows -**

**LIPEZ, Circuit Judge, concurring.** This case highlights an analytical flaw in our precedent that I identified in my dissent in United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 629 (1st Cir. 2001), namely, confining the Calder effects test to the purposeful availment prong of the specific jurisdiction inquiry. See id. at 623 ("[T]he 'effects' test is a gauge for purposeful availment and is to be applied only after the relatedness prong has already been satisfied."). It is the illogic of that precedent that has required my concurring colleague to justify our outcome here by raising the possibility of a special relatedness test for business torts.

Specific jurisdiction may be established based exclusively on the in-forum effects of the defendant's extra-forum conduct. That is the essence of Calder. Where the jurisdictional inquiry is necessarily focused only on effects because there is no in-forum conduct to consider, those effects must count in the relatedness inquiry or the effects test may become a jurisdictional dead end. That is, we will never get to the purposeful availment prong, except where the in-forum effects can also be deemed an "injury," as is the case here. See id. at 631, 633. Calder should not be restricted in that way. Indeed, Swiss American illustrates that a bright-line rule excluding effects from the relatedness inquiry will foreclose jurisdiction even in the face of substantial in-forum effects where the injury is presumed by law to occur

- 45 -

elsewhere.  See id. at 624 (noting that the "legal injury of conversion occurs where conversion takes place").  Such an outcome is at odds with "the flexible nature of our due process analysis," id. at 633, as exemplified by Calder.

The ultimate question in evaluating specific jurisdiction is whether the plaintiff's cause of action relates to the defendant's contacts within a forum.  The effects test enlarges the concept of in-forum contacts to include the in-forum impacts of conduct undertaken outside the forum.  I can see no rationale, in any type of case, for considering such effects in evaluating purposeful availment but excluding them from the relatedness inquiry.  In my view, therefore, there should be no need for a special category of economic or business tort.